1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO:  SBN 231163
   GRACE JUN, SBN 287973
3  IREDALE & YOO, APC
   105 West F Street, Fourth Floor
4  San Diego, CA 92101-6036
   TEL: (619) 233-1525   FAX: (619) 233-3221
5

6  Attorneys for Plaintiffs Estate of Kevin Brown and Rebecca Brown
7

8              **UNITED STATES DISTRICT COURT**
              **SOUTHERN DISTRICT OF CALIFORNIA**
9

10 THE ESTATE OF KEVIN          )  CASE NO. 15-CV-1583-DMS-WVG
   BROWN by its successor in    )
11 interest Rebecca Brown, and  )
   REBECCA BROWN, an            )  **THIRD AMENDED COMPLAINT FOR:**
12 individual,                  )
13                              )
            Plaintiffs,         )  1)   Execution of a Warrant Obtained In
14                              )  Violation of *Franks v. Delaware* (42
   v.                           )  U.S.C. § 1983)
15                              )  2)   Execution of an Overbroad Warrant
16 MICHAEL LAMBERT, an          )  (42 U.S.C. § 1983)
   individual, MAURA MEKENAS-   )  3)   Seizure of Property Beyond the Scope
17 PARGA, an individual, and DOES )  of the Warrant (42 U.S.C. § 1983)
18 2-50                         )  4)   Wrongful Detention of, and Refusal to
                                )  Return, Seized Property (42 U.S.C. §
19                              )  1983)
20            Defendants.       )  5)   Wrongful Death (42 U.S.C. § 1983)
21                              )  6)   Deprivation of Right of Familial
                                )  Association (42 U.S.C. § 1983)
22                              )
23                              )
24                              )  **JURY TRIAL IS HEREBY DEMANDED**
25                              )  **PURSUANT TO FRCP RULE 38**
26 _____  )
27

28

COME NOW Plaintiffs, Estate of Kevin Brown by its successor in interest Rebecca Brown, and Rebecca Brown as an individual, through their attorneys of record, and allege and complain as follows:

## I.
## GENERAL ALLEGATIONS

1.      This is an action under 42 U.S.C. § 1983 to redress the deprivation under color of statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured to the plaintiffs by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States. This action involves state law causes of action as well.

2.      Jurisdiction is based upon the existence of a federal question, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

3.      This Court has supplemental jurisdiction over any pendent state law claims under 28 U.S.C. § 1367(a).

4.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiff's claims occurred in San Diego County, within the Southern District of California.

5.      Plaintiffs have complied with Cal. Gov. Code §§ 800 et seq.

6.      At all times relevant to this complaint, Defendants DOES 2-25 were San Diego police officials and other agents of the CITY OF SAN DIEGO. At all times relevant hereto, these defendants were acting in their professional capacity.

7.      At all times relevant to this complaint DOES 26 - 50 were official agents and employees of other law enforcement and prosecution agencies. At all times relevant hereto DOES 26 - 50 were acting in their professional capacity.

8.      Plaintiffs are ignorant of the true names and capacities of DOES 2 -

50 and/or the facts giving rise to their liability and will amend this complaint once their identities as well as the facts giving rise to their liability have been ascertained.

9.      Defendants, including DOES 2 - 50, were the agents, servants and employees of each other and of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer. Each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

## II.
## PARTIES

10.     Plaintiff Rebecca Brown is a 61 year old resident of the city of Chula Vista. She is employed as a high school teacher. She had been married to decedent Kevin Brown for over twenty-one years at the time of his death in October, 2014

11.     Kevin Brown was 62 years old at the time of his death. He was retired, and had worked as a criminalist for the San Diego Police Department from 1982 to 2002.

12.     Kevin and Rebecca Brown placed their property in a living trust known as the Kevin and Becky Brown Trust on October 24, 2007. The will of Kevin C. Brown provided that his estate was to go to the corpus of the trust, to be held and administered as part of the trust. The trustee is Rebecca Brown, who is the sole trustee and beneficiary of the trust.

13.     Pursuant to California Probate Code § 8200, the will of Kevin Brown has been filed with the Superior Court on June 11, 2015, as Document No. D54467.

14.     Rebecca Brown is the successor in interest entitled to prosecute this action on behalf of the Estate of Kevin Brown.

15.     Defendant Michael Lambert is a detective with the Homicide Unit of the San Diego Police Department, assigned to Cold Case Homicide Unit.

16.     Defendant Mekenas-Parga was the SDPD Detective, with Lambert, responsible for the execution of the search warrant at the Brown home in January 2014.

17.     Kevin Brown worked as a criminalist in the San Diego Police Department Crime lab for twenty years, from 1982 until his retirement in 2002.

18.     Kevin Brown was a competent technician, but suffered from shyness, lack of confidence and a fear of public speaking.

19.     All his life, Kevin Brown struggled with depression, anxiety disorder and insomnia. His family history showed that both his parents and a sibling suffered from anxiety disorder.

20.     In 1992 Kevin and Rebecca Brown began a dating relationship in San Diego County.

21.     They developed a close and loving relationship and married at Lake Tahoe on August 21, 1993.

22.     They remained married for the rest of Kevin's life, until his death by suicide on October 20, 2014.

23.     In 2002, after 20 years at the San Diego Police Department working as a criminalist, Kevin retired.

### III.
### FACTS

24.     Mr. Brown was a criminalist in the S.D.P.D. laboratory at the time the forensic evidence from a murder victim, Claire Hough, was processed in 1984.

25.     The evidence processed included a single vaginal swab received by S.D.P.D. from the Coroner's Office, which had performed the autopsy on the body of Claire Hough, a fourteen-year (14) old murder victim.

26.     The autopsy was performed by Dr. M.A. Clark, who was a competent and experienced forensic pathologist. The significant findings of the autopsy and related forensic examinations include the following:

a.     Claire Hough was strangled to death;

b.     She had been stabbed in the throat and her genitals had been slashed with a sharp instrument;

c.     There was no evidence of sperm cells found in her vaginal vault;

d.     No spermatozoa were on the slides made for microscopic examination, which the Coroner's Office conducted;

e.     There were no sperm cells on the vaginal swab retained by the Coroner's Office;

f.     A test to identify the presumptive presence of semen, known as the acid phosphatase test, showed a level of acid phosphatase (an enzyme) consistent with the normal level of acid phosphatase in the vagina and was consistent with no semen being present.

27.     The autopsy involved taking samples of body fluids from the mouth, the anus, and the vagina of the victim. The pathologist typically would take two or three swabs, insert them simultaneously into the vaginal vault and move them in a consistent motion to insure that all the swabs acquired fluids from the same internal surfaces. The heads of the swabs would be held side by side. One or more swabs would be retained by the Coroner's Office. Normally, one of the vaginal swabs would be used to make smears for microscopic analysis to see if spermatozoa were present. One vaginal, one oral, and one anal swab would be given to the police agency involved in the investigation.

28.     In this case, those swabs were given to Randy E. Gibson, a S.D.P.D. criminalist who worked side by side in the S.D.P.D. facility with Kevin Brown.

Gibson took the swabs from the Coroner's Office, and returned to the S.D.P.D. lab facility, where he air-dried the swabs in the same room where Kevin Brown and the other criminalists worked, in an area near Kevin Brown's work station.

29.     Air drying involved placing the swab with the cotton tip exposed to the open air. Air drying was done to prevent mildew of the biological material on the cotton swab. The air drying involved the exposure to the open air in the lab where the criminalists did their examinations and tests.

30.     In 1984, DNA analysis was neither typical nor widespread. The protocols now in place to avoid contamination (which is the inadvertent exposure of biological material taken from a crime scene to other biological material, including biological material from laboratory technicians themselves, or biological material in the lab) were not used.

31.     In 1984, the criminalists in the S.D.P.D. lab did tests for the presence of blood and semen, among other things. These tests required using the reagents involved on known samples of blood and semen to insure their freshness and accuracy. It was a well-known practice, among lab personnel and criminal investigators, for criminalists to use their own blood and semen as known samples. These known samples, of the criminalists' own blood and semen, were maintained in the lab.

32.     In late 2012, sixty year-old retiree Kevin Brown became the subject of a criminal investigation of the San Diego Police Department (S.D.P.D.) after his DNA was found allegedly on a single swab, which had been taken from Claire Hough, who had been murdered in 1984. The S.D.P.D. claimed that Kevin Brown's DNA was from a "sperm fraction."

33.     The San Diego Police Department has a unit called "Cold Case Homicide Team," which began in 1995.

34.     This group works closely with the District Attorney's unit of the same name. This police unit relies heavily upon DNA analysis of evidence of homicides which occurred up to forty years in the past.

35.     The reliability of the DNA analysis is critical to the ability of this unit to effect arrests, and to the District Attorney's ability to achieve convictions.

36.     In late 2012, S.D.P.D. analyst David Cornacchia reported that blood stains on Claire Hough's Levi's jeans and of the torn zipper flap on her jeans contained DNA which belonged to Ronald Clyde Tatro.

37.     Tatro was a registered sex offender, who had been convicted of a sexual offense in Arkansas in 1974, and of false imprisonment in La Mesa, California in 1985. Tatro's Arkansas offense involved a rape in which he threatened the victim with a knife. Tatro died in Tennessee in 2011.

38.     Tatro was on parole for the 1974 Arkansas conviction at the time of Claire Hough's murder and was living in San Diego County.

39.     Tatro was a suspect in the 1984 murder of a San Diego prostitute, Carol DeFelice.

40.     Defendant Lambert was aware when he began the renewed investigation of Claire Hough's death in 2012, that cross-contamination of DNA due to handler's contact with evidence post-homicide is a common and well-documented occurrence.

41.     The likelihood of such cross-contamination is the reason why laboratory technicians in the S.D.P.D. were required to provide DNA exemplars.

42.     Because cross-contamination is a well-recognized, well-documented, and frequent occurrence, Kevin Brown and the other criminalists provided their DNA exemplars and had their resulting DNA profiles on file in a computerized database called CODIS.

43.     Lambert refused to accept that the results of Kevin Brown's DNA profile on the on a single swab were the result of cross-contamination.

44.     To admit that such cross-contamination occurred could have, in Lambert's view, caused future cold case DNA analyses from his Cold Case Unit to be subject to question, and thus imperil future prosecutions based on DNA results from evidence several decades old.

45.     Even though DNA extracted from blood left on Claire Hough's clothing matched that of a convicted rapist, Ronald Tatro, Lambert decided to use unconstitutional methods to investigate Kevin Brown for a crime he did not commit, and to attempt to connect Kevin Brown with Tatro, whom Kevin had never met nor seen.

46.     Lambert's tactics included systematically distorting the information provided to the judge to whom Lambert presented his search warrant request. This involved presenting false statements and omitting facts which were of utmost importance – the fact that the lab technicians dried the swabs containing evidence in open air, in a common space, without cough guards or other precautions to prevent cross-contamination; the fact that during the 1980s, the period when the Claire Hough evidence was in the common area where Kevin Brown worked, the S.D.P.D. criminalists, including Kevin Brown, commonly used their own blood and semen samples as known exemplars to verify the efficacy of chemical reagents in the lab; and that the Coroner's examination showed no sperm in the vaginal vault of Claire Hough in 1984, and forensic tests were consistent with the absence of semen so that Kevin Brown's DNA on a single swab was consistent with laboratory cross-contamination, not proof of his involvement in the murder of Claire Hough.

47.     Lambert engaged in distortion of Kevin Brown's past to suggest sexual perversion – that when he was a young, single man he went to strip clubs, took photographs of models in lingerie, and on one occasion was seen leaving a porn shop.

48.     Lambert ignored and omitted evidence that his investigation showed

Kevin Brown's character to be non-violent, and that Kevin's friends and associates had asserted to Lambert that Kevin would never have committed the violent murder of a teenage girl.

49.   The discovery of Mr. Brown's DNA had presented S.D.P.D. with an institutional dilemma.

50.   If Mr. Brown's DNA were present as a result of contaminating contact in the lab, it could call into question the procedures employed by the crime lab in the years before DNA analysis became prevalent, which would in turn bring into doubt the reliability of S.D.P.D. DNA analysis of "cold cases."

51.   Admitting publicly to the fact of cross-contamination, and the exposure of evidence handling techniques in the lab that caused such cross-contamination, was something that Lambert and his superiors in the S.D.P.D. Cold Case Unit wanted to avoid.

52.   Such a revelation would imperil the public acceptance of the Cold Case Homicide investigation program, which is premised in significant part on the reliability of DNA test results, obtained thirty or more years after the evidence had been gathered from the crime scene and the decedent.

53.   Lambert, the lead detective assigned to investigate the homicide of Claire Hough, the 1984 victim, had the obligation to conduct a fair investigation.

54.   Lambert did not conduct a fair investigation. Instead, he engaged in the systematic distortion and concealment of the truth in order to falsely implicate Kevin Brown and to serve the institutional interests of his unit, the S.D.P.D. Cold Case Homicide Unit.

55.   Lambert engaged in conduct that violated the constitutional rights of Kevin and Rebecca Brown.

56.   Aware that Mr. Brown suffered from mental health issues related to long-standing anxiety disorder and depression, Lambert set out to deliberately cause pressure and stress to him by illegally searching his home.

57.     Lambert interviewed witnesses in a misleading and suggestive manner.

58.     Lambert was on notice that Mr. Brown was at risk of suicide, based on information Lambert had obtained from seized medical documents, personnel records, interviews with acquaintances of Mr. Brown, and statements from Rebecca Brown and John Blakely, her brother, that Kevin was in danger of committing suicide.

59.     Lambert refused to return illegally seized evidence to Mr. Brown, his wife, and his mother-in-law, in order to falsely suggest to Kevin that S.D.P.D. was about to arrest Mr. Brown, and to pressure a man he knew to be suicidal by deliberately violating the law and retaining illegally seized materials.

60.     Lambert's conduct, which violated clearly established legal norms, includes the following:

A)     Defendant Lambert obtained a search warrant to search the home and cars of Mr. and Mrs. Brown by violating the legal requirement that a warrant be based on truthful evidence. In the declaration for the search warrant, Lambert, with knowledge of falsity or reckless disregard for truth or falsity, stated that multiple "swabs" had tested positive for Mr. Brown's DNA, and quoted the S.D.P.D. lab director as saying that cross-contamination was "impossible."

B)     Lambert omitted material and important information from his application for the search warrant. Information that Lambert knew, but which he deliberately omitted from the affidavit, included: the coroner's microscopic examination of vaginal smears from Claire Hough at the time of autopsy in 1984 was negative for the presence of sperm; it was common practice for criminalists including Kevin Brown at both the San Diego Police Department and San Diego Sheriff's Office during the 1980's to use their own blood and semen

samples in the crime lab to verify the effectiveness of forensic reagents used in examinations. It was common practice for swabs from different cases to be dried in the same location and to be exposed to cross-contamination. Mr. Brown's examination table was in close proximity to the table of the criminalist charged with examination of the forensic evidence in Ms. Hough's homicide.  Multiple witnesses informed investigators that Mr. Brown's character was entirely antithetical to that of a violent misogynist and that Kevin Brown was shy, socially anxious, and non-violent.

C) Lambert obtained and executed an overbroad warrant, which any reasonable police officer would have recognized as being unconstitutionally overbroad.

D) In executing the overbroad warrant, obtained by material misstatements and omissions, Lambert and  Mekenas-Parga seized an enormous quantity of materials beyond even the scope of the overbroad warrant. These documents included lesson plans, teaching materials, and childhood memorabilia of Rebecca Brown; copies of the Constitution, the Declaration of Independence, the Bible and other religious materials; photographs more than fifty years old; thousands of childhood photos of Rebecca Brown and her siblings; hundreds of videotapes of commercially available films; wedding photos of Mr. Brown's mother's-in-law wedding; and newspapers from Minnesota from the 1950s. Investigators under Lambert's control seized thousands of photos, scores of video cassettes, photo albums, and memorabilia.  All told, investigators seized fourteen boxes and four bags of materials and a computer hard drive. The vast majority of items seized were clearly beyond the scope of the warrant.

E)      Investigators under Lambert's and Mekenas-Parga's direction seized thousands of items that were, at the time of seizure, manifestly outside the scope of the warrant, which they illegally seized. Even after a thorough review of the seized items, which was completed by March 2014 for the paper documents, and May 2014 for the video and computer media, Lambert refused to return the illegally seized items to Mr. Brown or his family. Lambert's persistent refusal to return items that were clearly beyond the scope of the warrant, which had been illegally seized and were not evidence of criminal misconduct, was motivated by Lambert's knowledge that Kevin Brown was fixated on the issue of the return of the property. Lambert knew that Kevin believed that Lambert's continued retention of the seized property presaged for Kevin Brown a false criminal accusation, and abuse in jail pending trial. Knowing of the importance of the property's return to Kevin Brown's mental well-being, Lambert deliberately refused to return the wrongfully seized materials in order to generate stress on Mr. Brown, at the risk of his suicide. Lambert knew Kevin Brown was psychologically vulnerable, suffering from anxiety disorder and depression. Lambert knew that the retention of the seized property would cause Kevin greater and greater anxiety and fear, because Kevin believed that even though innocent, if charged he would be unable to make bail and would be subject to physical abuse while in jail because of his former employment with the Police Department.  This fear drove Kevin to suicidal ideation. Lambert knew that his continued retention of items, which had no evidentiary value and should be returned, created a substantial risk that Kevin Brown would kill himself. Lambert knew that a suicide could be

portrayed as a tacit admission of guilt - which would solve the S.D.P.D.'s institutional dilemma.

F) Lambert conveyed false information to witnesses with the expectation that Mr. Brown would learn of the disclosed information. After revealing to Kevin Brown that Lambert believed that Ronald Tatro was guilty of the murder of Claire Hough, Lambert told Kevin that he believed Kevin had murdered Claire Hough with Tatro. In August 2014, knowing that Tatro had been dead for over three years, Lambert was involved in planting a false item in the San Diego Union Tribune newspaper. Lambert believed that the article would cause stress to Kevin Brown. The article recited that the S.D.P.D. was seeking witnesses who knew Ronald Tatro. The ultimate effect of Lambert's investigative misconduct was to cause such stress and pain to Kevin Brown that he became obsessed with the fear that he would be falsely accused and imprisoned pending trial.

G)   After Mr. Brown's death, S.D.P.D. issued a defamatory press release. Among other statements, the press release falsely proclaimed that at the time of his death, "preparations were being made for Kevin Brown's arrest." The purpose for this press release was to suggest that Kevin Brown's suicide was an admission of guilt, and thereby preserve the reputation of the DNA component of the Cold Case Homicide program. The S.D.P.D. stated publicly that, with Kevin Brown's suicide, the case was now solved.

H)   Lambert even questioned Mr. Brown's Catholic priest and confessor. Lambert asked Monsignor Duncanson what Mr. Brown had shared with him within the sacrament of confession. Despite the clear provisions of California Evidence Code §§1032, 1033, and 1034 ("Penitential Communication;" "Privilege of Penitent;" "Privilege of

Clergy"), Lambert contravened Mr. Brown's rights, violating the law and fundamental principles of decency.

I)       Lambert applied for and obtained a warrant to search for evidence pertaining to the homicide investigation of the death of Barbara Nantais, and related evidence pertaining to her boyfriend, James Alt. There was no evidence of any kind, physical, testimonial or forensic, that implicated Kevin Brown in the death of Barbara Nantais, who was killed in 1978.

J)       Lambert, and/or someone acting at his behest, did not confine his deceit to misleading the judge. Lambert told representatives of the press in August 2014 that S.D.P.D. was trying to locate Ronald Tatro, and was seeking information from anyone who knew Tatro. Lambert made these false statements to obtain a press report which he believed would result in greater stress and pressure on Kevin Brown, by signaling intense and renewed investigative interest by S.D.P.D.

61.     This action seeks recompense for the Constitutional violations Lambert committed and caused: the violation of the home's privacy; the seizure of personal possessions unrelated to any crime; Lambert's wrongful detention and refusal to return the property for the purpose of causing pain to Kevin and Rebecca Brown; the causing of the death by suicide of Kevin Brown; and the consequent loss, and pain to his widow, Rebecca.

## DNA

62.     DNA technology, as it has developed in the last quarter century, has revolutionized the forensic investigation of crime. By its precision and sensitivity, DNA analysis has enhanced the reliability and accuracy of fact-finding in criminal cases.

63.     To understand the true meaning of a DNA result, however, it is critical to realize what an analytic result does and does not tell us. DNA analysis can determine whether contact occurred between the genetic material to be analyzed, and the genetic material of other persons, or of physical objects such as clothing.

64.     If proper testing protocols are used, and accurate algorithms employed, DNA results provide the genetic profile of a biological sample, and the frequency or infrequence of that profile in the population.

65.     DNA results cannot determine the precise timing of the contact between the DNA of the persons whose profiles are discovered. This is especially true when cross-contamination is the cause of the intermixture of multiple persons' genetic material, in the DNA.

66.     Forensic analysis of DNA recovered from a crime scene allows us to put a face to the criminal who did harm to the victim. But if the presence of the DNA in the sample is the result of contact or intermixture that occurred, not at the time and the scene of the crime, but at the lab where the genetic sample is tested, the precision and sensitivity of DNA testing lead, not to reliable fact finding and justice, but to misinterpretation, false accusation and injustice – made even worse by the scientific aura of infallibility of DNA analysis in the popular mind.

67.     In the lab, samples can be mislabeled or contaminated with evidence from unrelated crime scenes, or the lab technician's own DNA.

68.     Samples can be inadvertently switched.

69.     Forensic laboratories commit laboratory errors on a regular basis which can lead to false identification of suspects.

70.     Between 2003 and 2007, for example, a study of the Santa Clara County crime laboratory revealed fourteen instances in which evidence samples were contaminated with lab workers' DNA, three in which samples were contaminated by an unknown person, and six in which DNA from one case

contaminated samples from another. There were three instances discovered in which DNA samples were accidentally switched.

71.     A similar study of the Washington State DNA forensic lab resulted in similar findings, with contamination from criminalists who worked in the lab being the major cause of DNA cross-contamination.

72.     The leading cause of false DNA database matches is cross-contamination of samples

73.     The San Diego Police Department has resisted the transparency displayed by many other crime labs. These other labs have disclosed the results of audits and investigations of lab errors. S.D.P.D. has evinced a fierce resistance to admit to human error and the existence of cross-contamination in its lab.

74.     The phenomenal improvement of the power of DNA analysis ironically has greatly increased the risk of obtaining a result that is based on cross-contamination which occurs in the laboratory itself.

75.     DNA analysis can now obtain profiles from as little as a billionth of a gram of genetic material.

76.     DNA results, while precise and accurate, can therefore be misleading, because an infinitesimal quantity of genetic material left by a brush, an inadvertent touch, a sneeze or even a technician speaking in the area of a sample can result in contamination and a test result showing the DNA profile of the lab worker who accidentally and unintentionally deposited a microscopic residue onto the questioned sample.

77.     DNA analysis itself cannot tell the origin of the genetic material which yields the DNA profile. DNA analysis cannot tell us that the sample is from blood, sperm, saliva, or skin cells. That determination must be made by use of other tests or methods. Blood is identified by presumptive tests; sperm is identified by examination under a microscope. Thus, any assertion that DNA is from sperm is premised not on the DNA analysis itself, but on the identification of sperm cells by

microscopic examination, and the assumption that the DNA analysis is of the sperm cell, which is identified by the microscope.

78.     The most common problems are cross-contamination by microscopic traces of unrelated evidence and forensic scientists accidentally mixing their own DNA with the sample being tested.

79.     That can happen, for example, when the analyst talks while handling a sample, leaving an invisible deposit of saliva.

80.     There exists as well the issue of secondary transfer. In secondary transfer, there is no direct contact between a person and an object. There is a transfer of material through an intermediary, which could be another person or an object. For example: Person A shakes Person B's hand, and Person B then touches the handle of a knife.

81.     If secondary transfer occurs, Person A's DNA could be transferred first to Person B's hand and second to the knife handle. This would mean that even though Person A never actually touched the knife handle, his DNA could be present on it.

82.     Scientists have illustrated how easily DNA can transfer within and between items from a crime scene during transport to the lab, in a study involving objects such as used cigarette butts and bloodied knives.

83.     If a fingerprint were processed using powders and brushes that had been used on other evidence first, it is likely that the brushes and powders were contaminated with other DNA.

84.     Firearms being test-fired by technicians who did not wear gloves can result in the discovery of the technician's DNA on the firearms' surfaces.

85.     If the medical examiner fails to properly clean his fingernail clippers between bodies, artificial DNA mixtures can be created.

86.     Problems arise when evidence or bodies are examined on supposedly clean laboratory surfaces.

87.     Thorsten Schwark, at the University Hospital of Schlewswig-Holstein in Kiel, Germany, and his colleagues swabbed the shoulders and buttocks of six cadavers after they had rested on autopsy tables. They found that four of them were contaminated with DNA from bodies that had previously rested on the table – in two cases with DNA from more than one person.

88.     Today laboratory analysts wear gloves when handling evidence items.

89.     Today, great care is generally taken to clean scissors, tweezers, and other utensils between testing items.

90.     Some items are not cleaned as regularly. It is possible to transfer DNA from an item of evidence to a ruler, and then when the next item of evidence is examined and photographed, the DNA can transfer again from the ruler to this item

91.     A 2006 study by Poy and Van Oorschot demonstrated an example of secondary transfer when a mixed DNA profile was found on a swab taken from an examination magnifying lamp. This profile was searched in the lab's database. A match was found with a case that had been worked on the bench-top with the magnifying lamp. It was determined that DNA was transferred from the item being examined to the analyst's gloves and then onto the top of the magnifying lamp.

<u>POLYMERASE CHAIN REACTION (PCR) DNA ANALYSIS</u>

92.     Polymerase chain reaction ("PCR") is a technology used to amplify a single DNA segment by generating hundreds of thousands to millions of copies of the particular DNA sequence.

93.     PCR was developed by Kerry Mullis, who later won a Nobel Prize for Chemistry in 1993 for his development of the technique.

94.     PCR analysis is used in forensic science for DNA identification. The technique allows the replication of short DNA segments.

95.     The PCR technique is extremely sensitive. It can detect DNA left on a surface by the touch of a person's hand or finger.

96.     The "Touch DNA" method is named for the technique which analyzes cells left behind when assailants touch victims, weapons, or items at a crime scene.

97.     Touch DNA does not require blood or semen.

98.     It only requires a few cells deposited by the outermost layer of skin.

99.     The technique of DNA analysis used in this case was PCR.

100.    One of the biggest strengths of PCR for DNA typing is the degree to which DNA can be amplified.

101.    Starting with a single DNA molecule, millions or billions of DNA molecules can be synthesized after 32 cycles of amplification. This level of sensitivity allows scientists to extract and amplify DNA from minute or degraded samples and obtain useful DNA profiles.

102.    In this context, the sensitive nature of PCR works in a lab's favor, but it can cause problems if great care is not taken to avoid contaminating the reaction with exogenous DNA.

103.    Three main categories of exogenous DNA have the biggest impact on DNA-typing laboratories. These are: 1) DNA from the analyst, 2) DNA from other samples in the lab, and 3) DNA fragments of the allelic ladder used to determine the size of amplified alleles.

PROTOCOLS TO MINIMIZE CONTAMINATION

104.    Precise protocols for handling and testing of genetic materials are generally now followed in crime laboratories. These include the following:

     A) Dedicated areas close to the laboratories (pre and post PCR) should be designated as changing rooms/areas;

     B) Every laboratory must have its own dedicated equipment/reagents;

     C) Every laboratory should have its own dedicated laboratory coats or use different disposable coats in each laboratory;

     D) Molecular biology grade reagents and consumables must be used;

E) Items to be transferred between laboratories must be decontaminated prior to movement;

F) Post PCR rooms should be under pressure or have an airlock space between the lobby and the room itself or be geographically separated from the rest of the laboratory areas;

G) Restricted access to laboratories should be enforced with warning signs.

H) Every laboratory must have its own cleaning equipment for benches. Pre and post PCR cleaning of the floor must be done with dedicated equipment;

I) Cleaning personnel must be trained to work in laboratory conditions.

J) Environmental monitoring procedures should be written and records maintained.

K) Monitoring can be done by swabbing instruments and benches where exhibits are examined.

105.    Today many labs determine the DNA profile of their analysts, so contamination with an analyst's DNA can be detected by the appearance of his or her profile in the negative control reaction.

106.    At the S.D.P.D. lab, after it began to do DNA testing in 1992, Kevin Brown and the other analysts provided DNA for uploading of their profiles into the CODIS database. The purpose for this was explicitly to allow for determination of whether a DNA test result was the product of lab cross-contamination.

107.    A "reagent blank" control consists of all reagents used during a sample processing but contains no sample. This control is used to detect DNA contamination of the analytical reagents used to prepare the sample for analysis.

<u>COMMON PRACTICES IN SAN DIEGO POLICE DEPARTMENT</u>
<u>CRIME LAB DURING 1984</u>

108.   In 1984, the San Diego police lab was in an upstairs room of the old Police Department building on Harbor Drive. In the lab, several desks were located along the walls.

109.   In the central area of the lab were tables that were approximately six feet long and three feet wide. These tables, called examination tables, abutted each other.

110.   When criminalists examined evidence, they would place white butcher paper on the tables and examine the evidence, which would be placed on the paper.

111.   Up to six criminalists would conduct evidence examinations at the same time.

112.   A criminalist's DNA can contaminate evidence from his cough, sneeze, or even from microscopic amounts of spittle ejected while speaking.

113.   Today, there are pieces of equipment known in labs as "sneeze" or "cough guards" which are commonly used to prevent evidence from inadvertent cross-contamination from contact with criminalists.

114.   No such cough guards were used in 1984.

115.   In 1984, when bodily fluids such as saliva, blood, or vaginal secretions from a victim or suspect were to be analyzed, these fluids would be preserved on a swab.

116.   In order to prevent the formation of mold, criminalists would place the swabs in "drying boxes" to dry out.

117.   These drying boxes were approximately the shape and size of a tissue box with lattice work slats to hold the swabs, which were placed with the cotton ends up to dry.

118.   The cotton ends were exposed to the open air.

119.   In 1984, neither the San Diego Police Department nor the San Diego County Sheriff's Department conducted DNA testing at their labs.

120.   The San Diego Police Department did not begin testing for DNA until 1992, eight years after Claire Hough's murder. DNA testing was not yet widely conducted in police investigations of any jurisdiction in 1984.

121.   In 1984, standard forensic testing procedures in cases of possible sex crimes involved microscopic analysis of fluids for the presence of sperm (both motile and non-motile); and the testing of fluids for concentrations and amounts of the enzyme acid phosphatase.

122.   The acid phosphatase testing involved the use of chemical reagents. The test protocol required the use of known semen samples to verify that the chemical reagents were reacting accurately in detecting semen.

123.   In 1984, male lab technicians, including Kevin Brown, at both the S.D.P.D. and the S.D.S.O. labs would commonly use their own semen to test the reagents.

124.   Technicians would typically use their own semen as the known sample, before testing the unknown samples to be analyzed.

125.   Some technicians preserved their semen on cotton cloth, which they would then place in envelopes and store for extended periods on the tops of their desks or in desk drawers in the lab.

126.   These envelopes were often not sealed and would frequently be marked as known semen samples.

127.   As part of the testing procedures, technicians would remove a portion of the known semen sample, cut a piece from the semen-impregnated cloth with scissors, and place the piece of cloth in a vial.

128.   The reagent would be added to the vial, which would then react to the criminalist's known semen sample by changing color.

129.   The technician would then put the scissors in water, cut a piece of the unknown material with the same scissors, and test using the same reagent to determine the presence or absence of acid phosphatase.

130.   Because there was no DNA testing in use at the time, the rigorous protocols now in effect to avoid cross-contamination of samples were not in use, and inevitably there was cross-contamination - i.e. the mixing of genetic material having nothing to do with the criminal act with the genetic material taken and preserved as evidence from the crime scene.

131.   In the first half of the 1980s, criminalists in the S.D.P.D. lab sometimes did not wear masks or gloves when conducting forensic exams on stains.

132.   Technicians would sometimes handle undergarments with bare hands when conducting forensic tests, causing cross-contamination by leaving the criminologist's DNA on the garment.

133.   Even when gloves were used, if they were not changed frequently, cross-contamination from one piece of evidence to another could result.

134.   In this time period, there were no cough guards in the S.D.P.D. lab, allowing exposure by air of the DNA of technicians who sneezed, coughed, breathed or spoke in close proximity to forensic evidence.

135.   The older the physical evidence in a case, the less likely it is that proper techniques to avoid contamination of the evidence were exercised by crime scene personnel and laboratory analysts.

136.   The reason for this is neither ineptitude nor malice. It is simply a result of the rapid evolution of DNA analysis.

137.   Items which would never have been considered for DNA testing in the past are now routinely tested by labs across the nation.

## THE DEATH OF CLAIRE HOUGH

138.   On August 24, 1984, Claire Penelope Hough, age 14, was found dead on the beach at North Torrey Pines Road in San Diego. Claire had been strangled.

139.   There was a deep laceration in the front of her neck. Her left breast had been amputated.

140.   The Office of the Coroner of San Diego County performed an autopsy on Claire Hough on the following day, 25 August 1984.

141.   The autopsy findings revealed physical evidence of manual strangulation, blunt force injuries of the face, the wound in the neck and incisions in the chest.

142.   There was a single deep laceration which cut through the labia majora and upward through the urethra and clitoris.

143.   The Coroner's pathologist analyzed oral, anal and vaginal smears taken from Claire Hough's body.

144.   Microscopic analysis of these smears showed no spermatozoa.

145.   In addition to the microscopic analysis which showed no sperm, the Coroner's Office conducted a test on vaginal, oral and rectal samples for the presence and level of acid phosphatase.

146.   The results of these tests were consistent with no semen being present.

147.   The physical and scientific evidence showed no evidence of sexual intercourse or semen.

148.   The specific test the Coroner's Office performed on the vaginal, rectal, and oral smears was the acid phosphatase test.

149.   Acid phosphatase is an enzyme found throughout the body in both men and women. It is, however, most highly concentrated in the prostate gland.

150.   The prostate gland has more acid phosphatase than any other body tissue in men or women.

151.   The acid phosphatase test was used in 1984 to determine whether semen was presumptively present, since the content of acid phosphatase in semen is much higher than in any other bodily fluid.

152.    Acid phosphatase can be detected in other biological fluids, including vaginal secretions.

153.    The acid phosphatase test is a presumptive, not a definitive, test for the presence of semen.

154.    To confirm definitively that semen is present, visual detection of sperm cells is required. However, a high acid phosphatase level is strong evidence of the likely presence of semen.

155.    The acid phosphatase result in Claire Hough's case from the analysis of the vaginal swab done by the Coroner's office was consistent with a result from endogenous vaginal secretions, and was at the level typically found in women who had not had sexual intercourse in the prior forty-eight hours.

156.    Lambert failed to state in his affidavit that the differential extraction technique Cornacchia used relies on a microscopic viewing, not DNA analysis, to verify the presence of sperm; that the appearance of cells that Cornacchia saw was consistent not only with badly deteriorated and sparse sperm cells, but also with epithelial (skin) cells, which are often times indistinguishable from fragmented sperm cells; and that the assertion that Kevin Brown's DNA profile was from a sperm fragment was based upon the same kind of microscopic analysis that had been done by the Coroner in 1984, which showed no spermatozoa.

157.    Lambert failed to state in his affidavit the DNA test performed by Cornacchia does not, and cannot, tell what kind of genetic material (*e.g.* sperm, skin, blood, or saliva) provided the DNA profile. The claim that the DNA on the swab was from sperm depended not on DNA analysis, but on a tentative and questionable claim by Cornacchia that he saw evidence of a spare number of sperm cells on his microscopic view in October, 2012.

158.    The level of acid phosphatase present in 1984 was that which would normally be found in a woman who had not engaged in recent sexual intercourse.

159.    Oral, anal and vaginal swabs from the body of Claire Hough were taken by the Coroner's Office personnel and one set was given to an S.D.P.D. criminalist. At least one other set of swabs was retained by the Coroner's Office. The criminalist, Mr. Gibson, transported these swabs to the S.D.P.D. lab. He then air dried the swabs at a work station. Lab employees were in the area and could walk or stand by the work station where the swabs were drying. The swabs were then stored in the property room, and were removed for testing at a later time.

## DNA EXTRACTION TECHNIQUE AND THE NECESSITY FOR MICROSCOPIC VERIFICATION OF SPERM.

160.    The DNA analysis conducted by the DNA technician named Cornacchia involves extraction of DNA from cells by "lysing" (using strong chemical detergents), to release DNA from these cells.

161.    The mix is then placed in a centrifuge and spun. The spinning creates a pellet at the base of the centrifuge, which is referred to as containing the "sperm fraction."

162.    In order to ensure that the DNA from the sperm fraction is in fact from sperm cells, however, the analyst must, as part of the test protocol, first verify by a microscopic analysis that he sees sperm cells in the substance to be subjected to lysing and centrifugal spinning.

163.    Lambert's affidavit claims Cornacchia stated that the number of sperm cells present on the swab was "low."

164.    If Cornacchia in fact verified by microscopic visualization the presence of a low number of sperm cells (as opposed to erroneously identifying epithelial cells as sperm cells) on the S.D.P.D. swab, his finding clearly shows that contamination of the swab was due to lab contact with an item or area where Kevin Brown's semen had been used to test the effectiveness of lab reagents.

165.    This is so because the Coroner's microscopic examination of the vaginal swab of Claire Hough in 1984 showed *no sperm cells*.

166.   The Coroner's acid phosphatase result showed no presumptive presence of semen.

167.   The vaginal swab Cornacchia examined, which had been turned over to Gibson, the S.D.P.D. lab technician, was air dried and processed in the same lab and in the same area where other S.D.P.D. lab techs, including Kevin Brown, tested their own semen as known samples before using the reagents to do other forensic tests.

168.   If Cornacchia erroneously identified epithelial cells as "sperm," albeit in an extremely sparse amount, then the DNA result would be the result of contamination by touch or microscopic amounts of saliva caused by talking in the area of the drying swab.

169.   If Cornacchia's statements were true - if there were a low number of sperm cells on the Claire Hough vaginal swab from the S.D.P.D. lab - then the fact that the vaginal swab in the Coroner's office showed *no sperm* on its vaginal swab strongly confirms that Cornacchia's finding was the result of the S.D.P.D. swab's contact with an area or item in the lab that had touched Kevin Brown's semen.

170.   These facts - the results of the Coroner's microscopic analysis (no sperm) and the Coroner's acid phosphatase result (no presumptive presence of semen) are critical to understand the true meaning of Cornacchia's finding (if accurate) of a very low number of sperm cells on the S.D.P.D. swab.

171.   These facts show the cause of Cornacchia's DNA result was not sexual intercourse by Kevin Brown with the underage homicide victim, but a minor and fleeting contact with a lab surface or implement which caused the presence of a few cells on the swab, or airborne transfer of cells from Kevin Brown's dried sample.

172.   Absent the disclosure of these known facts, the recitation of the sole fact that DNA was from Kevin Brown's sperm fraction leads to an erroneous and devastating conclusion - that Kevin must have had sex with the dead girl. Lambert

omitted the true facts in order to have the judge signing the warrant misapprehend the truth.

173.   Defendant Michael Lambert wrote the search warrant affidavit for the warrant that was used for the search that occurred at the Browns' home on January 9, 2014.

174.   Lambert signed this affidavit under oath on January 3, 2014, at 8:45a.m.

175.   Lambert asserted that he had probable cause to search the Browns' home at 263 Vista Del Mar Court in Chula Vista, CA; the person of Kevin Brown; a 2011 Ford pickup truck; and a 2008 Honda Civic, both of which were registered to Kevin and Rebecca Brown. Lambert specified, *inter alia*, these items to be seized:

  a) a blood sample or mouth swab from Kevin Brown, to be used for DNA testing;

  b) papers, documents and effects demonstrating dominion and control of the home;

  c) computing and data processing devices including cell phones, computers and software, data storage media with evidence of monitoring the investigation of the murders of Claire Hough and Barbara Nantais and anything related to the name Ronald C. Tatro;

  d) newspaper articles relating to the murders of Claire Hough and Barbara Nantais;

  e) written address books, diaries or journals;

  f) S.D.P.D. reports relating to sexual assaults;

  g) magazines, videos, files, books or photos depicting teenage or pre-teen pornography, rape, bondage and sadomasochism;

  h) receipts for storage facilities, safety deposit boxes and "Cloud" storage;

i) photos or media relating to Claire Hough, Barbara Nantais, Ronald Tatro and/or James Alt.

## LAMBERT'S ASSERTIONS IN THE AFFIDAVIT

176. In the affidavit for the search warrant Lambert engaged in a series of deceptive and false statements.

177. Lambert subtly used some phrases which were literally true, but designed to mislead the judge reviewing the affidavit.

178. Lambert asserted "Hough had been strangled to death, sexually assaulted, and mutilated."

179. Claire Hough had been sexually assaulted - but the autopsy showed that the sexual assault was not sexual intercourse, but violent genital mutilation with a sharp-edged instrument.[1]

180. There was no evidence of semen or sperm found in 1984 when the evidence was examined by the Coroner's Office, before it was subject to contamination at the S.D.P.D. lab.

181. Lambert then asserted that in November, 2012, a DNA analysis showed Kevin Brown's sperm on "vaginal swabs" collected from Hough at autopsy.

182. In the warrant application, Lambert portrayed Kevin Brown as a sexual pervert, albeit with no fact that differentiated Kevin Brown from many young single men in their thirties: Kevin Brown went to strip clubs, photographed models in lingerie, made an off-color remark to a female criminalist, and may have shown a pornographic movie. DNA analyst, Annette Peer, viewed him as "creepy."

---

[1] Men who sexually violate women by force have commonly mutilated their victims, either because they were unable to maintain an erection, or because violent misogyny, not sexual release, was their true motivation.

183.   Lambert stated that he sought evidence to show that Mr. Brown and Tatro knew each other, killed Claire Hough in concert, and may have kept in contact with each other.

184.   Lambert stated that he believed Kevin Brown might be keeping sexual assault reports, reports relating to the Hough investigation and that he was following the progress of DNA techniques and the Hough and Nantais investigations.

185.   Lambert stated that he sought these items to find evidence of Kevin Brown's involvement in the 1984 murder of Claire Hough, Mr. Brown's knowledge of Ronald Tatro's involvement in such, and any evidence demonstrating that Kevin Brown was "following" the cases of Claire Hough or Barbara Nantais.

186.   The warrant was "an attempt to obtain information to link Brown and Tatro as the perpetrators acting in concert, in the commission of the sexual assault, mutilation and murder of Claire Hough".

## MATERIAL OMISSIONS

187.   Lambert's affidavit omitted material facts, the inclusion of which would have negated the existence of probable cause.

188.   Lambert failed to provide relevant and critical information, with intent to deceive the judge who reviewed the affidavit, and with knowledge of its materiality.

189.   These facts included:

A) In 1984, the Coroner's office conducted a microscopic examination of the smears from the swabs taken from Claire Hough's vagina. The examination was for motile or non-motile sperm. The examination revealed no sperm. This fact was noted in the report of M.A. Clark, M.D. pathologist for the Coroner who conducted the autopsy of Ms. Hough.

Lambert, with intent to deceive, did not disclose this result to the judge reviewing the warrant application.

B) The results of the forensic test for acid phosphatase showed 37 m.I.U. of acid phosphatase on the vaginal swab taken by the Coroner. This result is consistent with endogenous vaginal acid phosphatase – that is, the amount of acid phosphatase present in vaginal secretions of a woman who has not had sexual intercourse with semen deposited within 48 hours before death. This acid phosphatase result is consistent with the forensic rule of thumb that less than 50 m I.U. of acid phosphatase is consistent with the absence of semen. Lambert did not disclose to the judge that the acid phosphatase level was consistent with the absence of semen. Had Lambert included these material facts of which he had knowledge, the affidavit would not have provided probable cause for the issuance of a warrant for the search of the Browns' home.

C) A test for P30, for the presence of prostate specific antigen, could have established whether semen was present in Ms. Hough or on the vaginal swab. No test for P30 was conducted.

D) The autopsy report for Claire Hough did not find that Claire Hough had been raped or had engaged in sexual intercourse before her death. It found that there had been a laceration from a sharp cutting wound to her external genitalia, but no other forensic findings consistent with rape, *i.e.* no internal vaginal injuries consistent with rape. The cutting of her external genitals was certainly a "sexual assault" but it was not the same kind of assault as a rape involving sexual intercourse. Lambert cleverly used the phrase "sexual assault" to  suggest the latter, even though it was contrary to the autopsy findings.

E) There was no physical finding at autopsy that sexual intercourse had taken place. All the autopsy findings were to the opposite effect – no

sperm, no elevated levels of acid phosphatase, no other physical evidence
of sexual intercourse. While the brutal laceration of the genitalia was a
"sexual assault" of the most vicious kind, Lambert's use of the term was
designed to mislead the court into believing that Ms. Hough was
subjected to sexual intercourse with seminal ejaculation, when all the
evidence from the autopsy – physical findings, microscopic examination
and chemical testing showed the absence of semen, absence of sperm and
no evidence of penile penetration.

F)  The mutilation of Ms. Hough's body reflects vicious misogyny.
Lambert's previous interviews of witnesses never showed Kevin Brown
to be a violent or misogynistic person. To the contrary, witnesses had
described Kevin to Lambert as a shy, gentle and awkward person, whose
character was incapable of such viciousness.

G)  There had been multiple documented instances of contamination of
forensic samples in the SDPD crime lab. In the year before the DNA
results in this matter, the SDPD lab found an "unexpected DNA result" in
which DNA found in a reagent blank sample belonged to the son of an
SDPD analyst who had not been in the lab for a year.  This clearly
demonstrated DNA contamination in the SDPD lab. The fact of this and
numerous other incidences of DNA contamination in the S.D.P.D. lab
were deliberately omitted from the affidavit.

H)  Kevin Brown's semen, like that of other male technicians, in the 1980s,
was generally present in the general area in the S.D.P.D. lab where the
vaginal swab was dried and tested. The DNA result was almost certainly
the product of lab contamination, not proof of criminal rape and
homicide. Lambert deliberately omitted from the affidavit the standard
practices of the lab technicians in the years before DNA analysis was
used: that lab technicians, including Kevin Brown, used their own semen

in the lab to validate the accuracy of chemical reagents; the layout of the testing areas; the drying technique in which the swab was exposed in open air; and the fact that the analyst's own semen samples were regularly kept in the lab area and were used there to test reagents.

I)   Lambert quoted Dr. Wagner, the current medical examiner, as opinion that the low level of acid phosphatase on the vaginal swab collected by the coroner (37 m.I.U.) could be from "pre-ejaculation or an incomplete ejaculation" or from a full ejaculation with the acid phosphatase number "still low at the time of collection." In an attempt to cover himself, Lambert notes that Dr. Wagner stated that "acid phosphatase markers lower than 50 m.I.U. is *(sic)* unreliable." The information that a minute amount of DNA of Kevin Brown was on a swab is consistent with cross-contamination of the single swab which was tested. Lambert deliberately omitted the critical information that the level of 37 m.I.U. is consistent with the endogenous acid phosphatase level of a woman who has no semen within the vaginal vault, and that the average level of endogenous acid phosphatase in women is 38 m.I.U. Lambert misrepresented that acid phosphatase levels of less than 50 m.I.U. are "unreliable." These levels are reliable to demonstrate the absence of semen within the last 48 hours before Claire Hough's death. Dr. Wagner in fact told Lambert that the acid phosphatase level was also consistent with no sexual intercourse, no ejaculation, and no semen - statements which Lambert deliberately omitted from his affidavit.

J)   Lambert stated an opinion that because no DNA from Kevin Brown was found on Claire Hough's panty liner, and the only DNA on the panty liner was Claire Hough's, Claire Hough did not become vertical "after the sexual intercourse with Brown because, if she did, there would most likely be spillage from the seminal fluid from her vagina onto the panty

liner." Lambert omitted to state that leakage of semen, if it in fact were present in the vagina, could have easily occurred without Claire Hough becoming "vertical." Lambert omitted that Claire Hough was found lying partially on her right side with both legs flexed at the knee, in a posture which would have, because of gravity, caused leakage of semen, were it present, onto the panty liner. The absence of Kevin Brown's DNA on Claire Hough's panty liner is confirmative both that she had not engaged in intercourse immediately before her death, and that Kevin Brown's semen was not in her vagina. Lambert's deliberate omission of these facts was to mislead the Court.

K)  Lambert omitted from his affidavit this critical fact - for over a year since late 2012, the S.D.P.D. and Lambert had reviewed Tatro's record, residences, and history, and investigated Tatro's movements, habits, and associations, and there was no evidence of any kind that Tatro ever met, spoke with, associated with, or had any contact with Kevin Brown.

L)  The statement that DNA cross-contamination is *not* possible is not only false, but flies in the face of the unanimous knowledge of DNA scientists.

M) Lambert deliberately omitted materials information he knew from the S.D.P.D. investigation. This included information he had from a review of court records, police documents, and interviews of persons regarding Ronald Clyde Tatro. Lambert knew that Tatro's blood was found on the pants of the victim Claire Hough in copious amounts.

N)  Lambert knew of Tatro's *modus operandi* from his previous convictions: that Tatro had always acted alone and had used weapons, including a knife in threatening his victims. Lambert knew that Tatro admitted that on November 16, 1974, in Little Rock, Arkansas, Tatro raped a young woman by threatening her with a knife. Tatro stated in his guilty plea that his "compulsion" caused him to go into the parking lot by a liquor store

at 7:30 in the evening where he told the victim, an employee, when she came outside that his car was broken and he needed her help. Tatro shoved her into his car in the parking lot, drove briefly, then put her in the trunk. He drove to a "cut-off" in the road, removed his victim from the trunk, and forced her to have intercourse by holding a knife in her open mouth. The victim did not physically resist in the face of this threat. On November 27, 1974, Tatro went to the Ouachita Regional Mental Health Center in Hot Springs, Arkansas. The psychiatric evaluation, by a Dr. D.R. Butts, M.D., of which Lambert had knowledge, stated: Mr. Tatro presented himself voluntarily at our Clinic to see Mr. Goff, one of our counselors, and then was subsequently referred to me on 11/18/74. Mr. Tatro is a 31 year old, married, white male, who was released from prison in another state recently for assault with intent to commit rape. He appeared as an extremely uncomfortable, anxious man, who was desperate for some assistance. He was extremely fearful that law enforcement authorities would catch him for a crime (rape) which he admitted to committing on the Saturday previous to his coming into our Clinic. He did not describe much in the way of details of this incident, except that he stated that he did rape a woman and that he had no control over his compulsion to do so. He further stated that he had had a similar problem for many, many years, dating back to his early childhood, and that he had been arrested in another state and placed in a correctional institution, secondary to such an act.

O)  The report demonstrated the nature of Tatro's crimes - impulsive, compulsive, resulting from his individual pathology, committed alone for bizarre and personal reasons. On June 25, 1985, Tatro falsely imprisoned a young woman in La Mesa, California, by threatening her with a stun gun and forcing her into his car. The victim resisted and fled. Tatro pled

guilty to false imprisonment, was sentenced to three years, and returned to Arkansas where he served an additional decade in confinement for violation of his parole for the 1974 conviction.

P)  Tatro had always acted alone, and never with a confederate. Tatro had employed a knife during his 1974 crime. He had been paroled for only a brief period when Claire Hough was murdered on a beach, stabbed in the neck, and her genitals slashed. The absence of sperm or semen, coupled with Tatro's previous conduct, would have permitted the reviewing judge, had he been provided the information, to infer that the death of Claire Hough occurred at the hands of Tatro alone, when, after he began to remove her clothes, she resisted, and Tatro stabbed, mutilated and murdered her.

Q)  Lambert omitted as well from his declaration the results of the investigation from October 2012 to January 2014 that there was no evidence of any kind that Kevin Brown had ever seen, spoken with, or met Ronald Tatro.

R)  Lambert omitted from his affidavit the findings of the FBI analysis of the psychological profile of the killer of Claire Hough - a profile that matched that of Ronald Tatro, but not of Kevin Brown.

S)  Lambert omitted as well the findings of all the earlier investigations of Claire Hough's murder - that it was almost certainly the act of a single man acting alone.

<u>FALSE OR MISLEADING STATEMENTS IN LAMBERT'S AFFIDAVIT</u>

190.   Lambert included false statements in the affidavit for the search warrant, with knowledge of their falsity or reckless disregard for their truth or falsity.

A) Lambert stated in his affidavit that Kevin Brown's DNA, found on "swabs" taken from Claire Hough's vagina was found in the form of

sperm. Lambert stated that this indicates that Kevin Brown had sexual intercourse with 14 year old Claire Hough. Lambert's statement that this "indicates that Kevin Brown had sexual intercourse with Claire Hough" was false, or made with reckless disregard given Lambert's decision to conceal from the Court the practice of S.D.P.D. criminalists including Kevin Brown, to use their own blood and semen as known samples for use in verifying the accuracy of the reagent chemical reactions in the S.D.P.D. lab where the Hough swab was present.

B) Lambert recited that the San Diego Police Department Lab Manager, Jennifer Shen, stated that Mr. Brown had no access to the evidence in the Hough murder and that "cross DNA contamination *(sic)* is not possible." These statements are false. Kevin Brown was working in the same lab area as Mr. Gibson, who had retrieved an oral, an anal, and a vaginal swab taken from Claire Hough from the Coroner's office in August, 1984. Kevin Brown worked in the same room and was in close proximity to the work area of Gibson, and worked in the area where the swabs were typically dried.

C) Lambert's claim that "cross DNA contamination *is not* possible" is false. As a general matter, DNA cross-contamination is not only possible - it is a forensic fact of life. If the claim is that cross-DNA contamination is not possible in the case of Claire Hough, that too is manifestly false. Cross-contamination, even in today's labs, with careful execution of detailed protocols, is possible. In the SDPD lab of 1984, when personnel acted without awareness of DNA, and without protocols in place to avoid DNA contamination, cross-contamination was inevitable. Neither Ms. Shen, nor any competent lab manager could or would say that "cross DNA contamination *is not* possible". The statement is false; the attribution of the statement to Jennifer Shen is false. In a prosecution in San Diego

Superior Court for a 1989 homicide, a defendant had proffered the results of a DNA test showing that the vaginal swab of the decedent had the DNA of another person, not the defendant nor the victim. The San Diego County District Attorney's Office showed that this result was likely due to cross-contamination in the San Diego Police Department lab. The District Attorney's expert postulated the likely source of cross-contamination as being "sperm dust" - that is, microscopic air borne particle that caused the DNA result. The defendant in that case pled guilty to the homicide.

D)  According to the affidavit, San Diego Police Crime Lab Technician Randy E. Gibson was present at the autopsy on August 24, 1984, at 10:15 a.m. While at the autopsy, Gibson took custody, *inter alia*, of *one vaginal swab*. Lambert states that DNA technician Cornacchia reported that he developed an unknown male profile from the sperm fractions "collected from the *swabs*" which was found to match the profile of Kevin Brown. Throughout the affidavit, Lambert refers to Kevin Brown's sperm/semen being found on "*swabs*". This statement is false, and designed to mislead by suggesting multiple swabs (including swabs retained by the Coroner) contained Kevin Brown's DNA. Kevin Brown's DNA was found on one, and only one, swab by Cornacchia. That swab was one from the S.D.P.D. lab - none of the swabs from the 1984 autopsy ever showed sperm, semen, or Kevin Brown's DNA.

E)  There were at least two vaginal swabs taken during the autopsy. Only one, the one taken to the S.D.P.D. lab, air dried and retained there, had DNA associated with Kevin Brown. The other swab, the one examined in 1984 when the evidence was fresh and uncontaminated, had no sperm. The false claim that Kevin Brown's DNA was found on "swabs" was deliberately made to suggest that the DNA was found not only on the

swab stored at SDPD with which Kevin Brown would have been in proximity, and which had been in the lab where Kevin Brown's semen samples were located, but also on the swab(s) from the Coroner's autopsy, with which Kevin could not have been in contact. Were Kevin Brown's DNA on the swab in the Coroner's possession, the likelihood of contact between Kevin Brown and Claire Hough would be established. If sperm were the source of DNA on the swab from the Coroner's office, then the claim that Kevin Brown had sexual relations with Claire Hough would be forcefully supported. Lambert's repeated use of the plural "swabs", made in multiple false statements, was designed to mislead the judge into believing that Mr. Brown must have had sexual relations with 14 year old Claire Hough. The single swab from the S.D.P.D. lab is metamorphosed in Lambert's affidavit into multiple "swabs": 1) Lambert states "During the autopsy swabs were taken from Hough's vagina. Kevin Brown's DNA was found on those *swabs*"; 2) "Kevin Brown's sperm was found on vaginal *swabs* collected from Hough at autopsy"; 3) "He [Detective Rydalch] requested the San Diego Police Crime Laboratory to examine the following items collected and impounded during the initial investigation in this case for DNA belonging to someone other than Claire Hough: Vaginal *Swabs*..."; 4)According to David Cornacchia's report dated November 30, 2012, he identified 3 unknown male DNA profiles on the following four items of evidence: Sperm fraction: Claire Hough's vaginal *swabs*...; 5) According to Cornacchia, the number of sperm cells present on the *swabs* was low...; 6) "During the autopsy swabs were taken from Hough's vagina. Kevin Brown's DNA was found on those *swabs*." Each of these assertions that Kevin Brown's DNA was found on *swabs* is false, and made with intent to mislead. (Emphasis added)

F)  Lambert stated that he had probable cause to search the Browns' home and cars for evidence pertaining to the 1978 murder of Barbara Nantais and the beating of her boyfriend James Alt. This was a false statement. Lambert had no evidence of any kind that Kevin Brown was in any way connected to the murder of Barbara Nantais or the beating of James Alt. The absolute lack of any evidence justifying the search of the Browns' home and cars on this basis made the execution of the warrant illegal, and any reliance on the warrant by Lambert entirely unreasonable.

191.   On Thursday, January 9, 2014, Lambert and Mekenas-Parga led a team of approximately twelve other police officials to execute the search warrant for the Brown's home and cars. Lambert and Mekenas-Parga seized and authorized the seizure by the others of many thousands of items that were far beyond the scope of the warrant.

192.   For illustrative purposes, a listing of only a small fraction of the illegally seized items is attached as Exhibit A, and incorporated herein by reference.

193.   On Friday, January 10, 2014, Kevin Brown spoke to defendant Lambert at the S.D.P.D. Kevin explained that he did not know Ronald Tatro and had never seen nor met Tatro.

194.   Kevin told Lambert that he never knew Claire Hough, and certainly never killed her.

195.   Kevin told Lambert that the DNA result was the product of laboratory cross-contamination.

196.   Kevin Brown explained the configuration of the police lab in 1984, the method by which swabs were dried, and the manner in which lab analysts used their own semen as a known sample to verify the efficacy of chemical reagents designed to detect acid phosphatase.

197.    Lambert told Kevin Brown that he did not believe him; that Kevin should confess; and that Lambert did not accept his statements.

198.    Witnesses had informed Lambert that Kevin Brown was often shy and easily embarrassed.

199.    Lambert had reviewed Kevin Brown's San Diego personnel file, which recounted Kevin Brown's difficulty in testifying, his nervousness, tentativeness and awkwardness in courtroom presentation.

200.    Lambert had obtained material in the course of his search which showed that Kevin Brown had undergone therapy for anxiety disorder and depression.

201.    Lambert had learned that Kevin Brown suffered from insomnia.

202.    Lambert had learned that Kevin Brown was taking prescription medication for the treatment of depression.

203.    Kevin Brown, the target of Lambert's investigation, believed that the return of the wrongfully seized items would signify that he was no longer in danger of being falsely accused of murder, arrested, and imprisoned pending trial.

204.    Lambert knew that Kevin Brown was at high risk for committing suicide.

205.    Lambert acted, at minimum, with deliberate indifference, and refused to return the wrongfully seized items for the purpose of causing mental anguish to Kevin Brown and with knowledge that this wrongful refusal created a high likelihood that Kevin Brown would kill himself.

206.    Lambert himself falsely stated to Kevin Brown that Kevin would be arrested.

207.    Lambert repeated these statements to third parties about arresting Kevin Brown with the intent that these statements be repeated to Kevin Brown to increase his suffering.

208.   Lambert made these false statements for the purpose of causing Kevin Brown to "crack" and with deliberate indifference to the likelihood of Mr. Brown's suicide.

209.   Lambert's actions, committed intentionally and with the foreseeable likelihood of causing Kevin Brown to commit suicide, ultimately resulted in Mr. Brown's suicide.

210.   Rebecca Brown had made repeated requests to Lambert for the return of the seized property.

211.   Beginning in March 2014, Rebecca Brown spoke to Lambert on several occasions.

212.   Lambert returned only her personal laptop despite her multiple requests for the release of all of the property.

213.   On June 1, 2014, Rebecca Brown requested the return of her property.  Lambert put her off, telling her that he was "close to giving all the property back."

214.   Kevin Brown kept a calendar which he would mark off each day, waiting until the property would be returned.

215.   To Kevin Brown, the return of the property meant that he would probably not be falsely accused; to him, the detention of the property meant the continued likelihood of false accusation, arrest, and detention in custody, which he greatly feared.

216.   After July 4, 2014, Lambert had returned no other property.

217.   Lambert continued to hold the property even though a thorough review of the property had revealed that *none of it* was relevant to any homicide investigation.

218.   None of it was probative of guilt of Kevin Brown, and almost all of it was beyond the scope of the warrant and had been illegally seized in the first instance.

219.   In July, Lambert put Rebecca Brown off again, saying he would be done by the end of the month.

220.   At the beginning of August 2014, Rebecca Brown requested the property be returned. Lambert stated that there was an ongoing investigation and refused to return anything.

221.   In August 2014, Lambert and/or a person acting at his behest, engaged in planting a false item in the San Diego Union-Tribune.

222.   In it, even though Lambert and S.D.P.D. knew that Tatro had been dead since 2011, Lambert and/or another caused the article to state that the S.D.P.D. was seeking to locate Ronald Tatro, and solicited information from anyone who knew Tatro or anyone with whom Tatro associated.

223.   In September, 2014, Rebecca Brown asked for the return of her mother's belongings. Lambert refused to return any property.

224.   Kevin Brown's mental state continued to deteriorate.

225.   Lambert, understanding the significance to Kevin Brown of the continued detention of the seized property and desiring to increase stress on Kevin Brown, refused again and again to return property which had been seized illegally, which had been reviewed and found to have no relevance, probative value, or evidentiary significance.

226.   Lambert retained the property knowing of the significance its illegal detention had on Kevin Brown; knowing that it increased anxiety and distress in Mr. Brown; knowing that Mr. Brown's suicide was a foreseeable consequence of the continued illegal detention of the seized items; intending to cause such anxiety with knowledge of its likely results, i.e. Mr. Brown's suicide.

227.   On Friday, September 26, Rebecca Brown saw her husband in his bed, groggy, barely able to move, and speaking of a note he had written. The note, which was on a computer, told Rebecca he wanted to thank her for the last twenty years.

228.    The note said to thank Monsignor Duncanson, his priest, and Herb Selby, a neighbor and friend.

229.    Rebecca saw a bullet on the floor.

230.    Rebecca removed a gun from her husband's possession.

231.    Kevin Brown's brother-in-law was John Blakely. Mr. Blakely is an attorney. He lived with the Browns during 2014.

232.    John spoke on several occasions with defendant Lambert in 2014.

233.    Mr. Blakely conveyed to Lambert the effects Lambert's actions had on Kevin Brown's mental condition, the debilitating effects the continued illegal detention of the seized items had on Mr. Brown's state of mind, and the likelihood that Mr. Brown would, as a result of the stress engendered by Lambert, kill himself.

234.    John Blakely spoke to Lambert in late September, 2014.

235.    John told Lambert that in late April or May, 2014, he had removed two firearms from the home due to his concern about Kevin Brown's mental state, and fear that Kevin would kill himself.

236.    Kevin had talked about suicide, John explained to Lambert.

237.    Thereafter, Mr. Blakely told Lambert Kevin seemed to improve, and John had returned the guns.

238.    Because of his renewed concern over Kevin Brown's well-being, Blakely said, he had recently confiscated the guns again.

239.    Mr. Blakely told Lambert that Kevin Brown had previously discussed his own suicide.

240.    John Blakely told Lambert that Kevin was in a downward spiral, and for this reason he was deeply concerned that he would kill himself because of the stress engendered by Lambert's actions.

241.    On Wednesday, October 1, 2014, Lambert spoke in person with Rebecca Brown. Lambert told Rebecca Brown that he was conducting a "wellness check" to make sure of her safety.

242.    Rebecca Brown told Lambert that she was not in danger but that Kevin Brown was not in his right mind and that she was fearful that he would kill himself.

243.    Kevin Brown's attorney, Gretchen Von Helms, repeatedly communicated requests for return of property to Lambert through conversations with S.D.P.D. Detective Lori Adams, and described the desperate mental plight of Kevin Brown.

244.    On October 20, Kevin Brown, as a result of the conduct of Lambert and DOES 1-50, committed suicide, hanging himself from a tree at Cuyamaca State Park.

**FIRST CAUSE OF ACTION**
**EXECUTION OF A WARRANT OBTAINED IN VIOLATION OF *FRANKS V. DELAWARE* (42 U.S.C. § 1983 )**

**(BY BOTH PLAINTIFFS AGAINST DEFENDANT LAMBERT AND DOES 2 - 50)**

245.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

246.    Lambert and DOES 2 - 50 obtained a search warrant for the search of the home of Kevin and Rebecca Brown, and two vehicles that they jointly owned.

247.    Defendants then executed this search warrant, seizing property that belonged to both Kevin and Rebecca Brown.

248.    It is clearly established law that a search warrant obtained by the inclusion of false statements, known to be false, or made with reckless disregard, or obtained by the omission of material evidence known to the affiant which negates probable cause, is an invalid warrant.

249.    The warrant Lambert obtained for the January 9, 2014, search of the Brown's home and vehicles was obtained by such false statements, and deliberate material omissions.

250.    Had Lambert truthfully disclosed the evidence of which he had knowledge, and included the material evidence which he omitted from the affidavit, there would have been no probable cause in the warrant application to justify a search of the Browns' home. No reasonable judicial official would have authorized the search warrant that Lambert requested.

251.    The execution of this wrongly obtained warrant violated the Fourth Amendment rights of Kevin Brown and Rebecca Brown.

252.    This violation of their Fourth Amendment rights under color of state law by Lambert and DOES 2-50 caused damages, including shock, stress, pain, and suffering.

## SECOND CAUSE OF ACTION

### EXECUTION OF AN OVERBROAD SEARCH WARRANT ON WHICH NO REASONABLE POLICE WOULD RELY (42 U.S.C. § 1983)

### (BY ALL PLAINTIFFS AGAINST DEFENDANTS LAMBERT, MEKENAS-PARGA, AND DOES 2-50)

253.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

254.    The Fourth Amendment to the U.S. Constitution provides "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, should not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

255.    The Fourth Amendment was written to prohibit the practice of the use of general warrants (called Writs of Assistance before the Revolution).

256.    The Fourth Amendment requires a truthful showing of facts demonstrating probable cause and specifically describing the things to be seized.

The warrant in this case is so overbroad that it could permit the seizures of virtually any document.

257.   Lambert inserted into his proposed warrant a clause which he used to seize all computers, cells phones and smart phones as to which there had been no showing of probable cause. Lambert obtained a warrant which permitted him to seize without limitation, and with no showing of probable cause, unspecified "address books, diaries/journals, handwritten in nature."

258.   The search warrant was unconstitutionally overbroad. The overbreadth was so clear that no reasonable police officer, including Lambert and Mekenas-Parga could have relied on the warrant as being valid.

259.   The search warrant failed to specify with reasonable limitation, the items to be seized.

260.   The search warrant constituted a general warrant, permitting without limitation the search and seizure of thousands of items within the Browns' home.

261.   The search warrant set forth general categories of items to be seized as to which no showing of probable cause had been made.

262.   The defects in the search warrant were so obvious that no reasonable police officer could have relied on it in good faith.

263.   For example, Lambert and Mekenas-Parga knew that Mr. and Mrs. Brown lived at the place to be searched. Lambert had no question that Kevin Brown lived at the place to be searched, and had lived there for many years. Despite the absence of any question as to the Browns' residence in the home, Lambert included in the warrant a "dominion and control" clause that was so broad as to allow the seizure of thousands of items as alleged "dominion and control" evidence, even though there was no question as to who had dominion and control over the home.

264.   Lambert knew that Kevin and Rebecca Brown owned the home and lived in the home. The warrant nonetheless provided for the seizure of: "papers,

documents and effects tending to show dominion and control over said premises, including keys, lease, rental, or mortgage agreements, utility bills, canceled mail, prescription bottles, fingerprints, *clothing, photographs, photographic negatives, image disks, memory sticks, undeveloped film, homemade videotapes, digital images, handwritings, documents* and effects bearing a form of identification such as a person's name, photograph, Social Security number or driver's license number; and to intercept incoming phone calls, either landline of cellular, during execution of the warrant, to view any video tapes seized pursuant to the warrant." (Emphasis added).

265.    This provision cited above was hopelessly overbroad and in violation of clearly established law.

266.    A second provision of extraordinary overbreadth was the provision of the warrant authorizing Lambert to:

To seize, view and forensically examine *any computing or data processing devices, including cellular telephones capable of storing images, smart phones and tablet devices* and associated peripheral equipment such as computer or data processing devices and associated peripheral equipment such as computer units, keyboards, *central processing units, external drives and/or external storage (flash/thumb drives), tape and/or disk, terminals and/or video display units* and/or other receiving devices and peripheral equipment such as printers, automatic dialers, modems, acoustic couplers, associated telephone sets, and any other controlling devise(s), any computer or data processing software and the device(s) on which such software is stored such as hard disks, floppy disks, JAZ disks, ZIP disks, integral Ram or ROM units, cassette tapes, magnetic tape reels, any other permanent or transient storage device, any computing or data processing literature, printed or otherwise, and all manuals for the

operation of the computer and software, together with all handwritten notes or printed material describing the operation of the computer, and confidential password lists to enter secured files.

(Emphasis added).

267.   Lambert sought and obtained a warrant which permitted, in addition to seizure, the forensic examination of the listed items for evidence of monitoring the progress of the investigation of the murders of Claire HOUGH and/or Barbara NANTAIS, and anything related to the name Ronald C. TATRO or James ALT; to include e-mail, Internet history, documents, journals, deleted files or any other evidence related to the murder of Claire HOUGH and/or Barbara NANTAIS and anything relating to, *inter alia*, the name James ALT.

268.   The warrant went on to authorize the seizure of "anything relating to the items" listed in the warrant, a vague and overbroad provision. (Emphasis added).

269.   Lambert demonstrated no evidence of any kind, much less probable cause, to permit a search and seizure of computer media for evidence relating to Barbara NANTAIS or James ALT.

270.   The execution of the clearly overbroad warrant by Lambert, Mekenas-Parga and DOES 2-50 resulted in the seizure of thousands of items, as to which no probable cause had been shown, and which were seized as a result of the unconstitutionally overbroad warrant.

271.   The following combined to make Lambert's warrant a general warrant: the overbreadth of the "dominion and control" clause of the warrant; the unspecified and unlimited provision for seizure of "address books, diaries/journals, handwritten in nature;" the allowance for seizure of any computer, cell phone or smart phone without limitation; the allowance for seizures and forensic examination of evidence relating to Barbara Nantais or James Alt, as to which no

basis was demonstrated; and the authorization for seizure of "anything relating to the items" listed in the warrant.

272.    Lambert's warrant imposed no limitations on the wholesale and indiscriminate seizure of thousands of personal items. The execution of such a "warrant" by Lambert, Mekenas-Parga and DOES 2-50 was in violation of the Fourth Amendment.  The conduct of Lambert, Mekenas-Parga and DOES 2-50 caused damages to Plaintiffs as set forth in this complaint.

## THIRD CAUSE OF ACTION

**SEIZURE OF PROPERTY BEYOND THE SCOPE OF THE WARRANT (42 U.S.C. § 1983) (BY BOTH PLAINTIFFS AGAINST DEFENDANT LAMBERT, MEKENAS-PARGA, AND DOES 2 - 50)**

273.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

274.    Lambert, Mekenas-Parga and DOES 2-50 executed the warrant on January 9, 2014.

275.    Clearly established law permits the seizure of evidence during a search, if that evidence is specified as being subject to seizure under the terms of the warrant.

276.    Instead of seizing evidence specified within the scope of the warrant, Lambert, Mekenas-Parga and DOES 2-50 seized thousands of documents and items that were not within the scope of the warrant, and that were manifestly unrelated to the police investigation.

277.    The conduct of Lambert, Mekenas-Parga and DOES 2-50 was that of an official executing a general warrant.

278.    As an example of the overbreadth of their seizures, and by way of illustration, attached as Exhibit A is a listing of only a small fraction of the documents and items seized which were beyond the scope of the warrant.

279.    Lambert's, Mekenas-Parga's and DOES' actions in illegally seizing possessions not set forth in the warrant violated 42 U.S.C. 1983 and the Fourth Amendment, and caused mental and emotional damage to Kevin and Rebecca Brown.

## FOURTH CAUSE OF ACTION

### WRONGFUL DETENTION OF SEIZED PROPERTY (42 U.S.C. § 1983) (BY BOTH PLAINTIFFS AGAINST DEFENDANT LAMBERT AND DOES 2 - 50)

280.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

281.    It is clearly established law that the continued detention of illegally seized items constitutes a Fourth Amendment violation.

282.    In this case, Lambert and DOES 2 - 50 illegally detained the seized property of plaintiffs.

283.    This detention occurred from January 9, 2014 until after Kevin Brown's death.

284.    Lambert and DOES refused to return the seized property despite multiple requests from Plaintiffs and their counsel.

285.    Lambert and DOES refused to return the seized property even though the S.D.P.D. had reviewed all non-electronic items by the end of March 2014 and all evidence by late May 2014, and knew that none of the seized materials was evidence of a crime, or relevant to any investigation of Kevin Brown.

286.    The wrongful and prolonged detention of plaintiff's property violated the Fourth Amendment, and caused damages to Plaintiffs.

## FIFTH CAUSE OF ACTION

### 1983 WRONGFUL DEATH (42 U.S.C. § 1983) (BY BOTH PLAINTIFFS AGAINST DEFENDANTS LAMBERT AND DOES 2 - 50)

287.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

288.   Lambert learned through witnesses and from a conversation with Kevin Brown that Kevin was deeply affected by the accusation that he was involved in the death of a young girl.

289.   Lambert learned as well that Kevin Brown placed a deep symbolic importance on the return of the items seized from the home in the January 9, 2014 search, and that in Kevin's perception, the continued detention of those items meant the likelihood that Kevin would be arrested, held without bail, subjected to abuse in jail because of his previous work as an S.D.P.D. employee.

290.   Lambert understood that the return to Kevin Brown of even some of the seized items would likely result in Mr. Brown's depression lifting, and the cessation of suicidal thoughts.

291.   Lambert learned from both John Blakely and Rebecca Brown that the continued detention of the seized property was plaguing Kevin Brown, and that Kevin was deeply depressed, and in danger of committing suicide.

292.   Lambert had decided early in 2014 that Kevin Brown was psychologically vulnerable to pressure and stress.

293.   Lambert decided that he would employ a variety of stratagems to cause Kevin Brown to break.

294.   These stratagems included causing stress and panic by telling Kevin Brown he would arrest him; telling third parties whom Lambert believed would convey information to Kevin Brown, that Lambert intended to arrest Kevin Brown.

295.   Lambert made these statements even though he did not intend to arrest Kevin Brown, and knew that there was no probable cause to effect an arrest.

296.   Lambert learned that Kevin Brown was at severe risk of suicide because of Kevin's personal psychological makeup, anxiety disorder and depression.

297.   Lambert learned that Kevin Brown had evinced suicidal ideation and that his wife and brother-in-law were deeply concerned that the continued stress

would result in Kevin Brown's succumbing to an irresistible urge to end his torment by suicide.

298.    Lambert elected to increase the stress.

299.    Lambert decided, even though the seized items were exculpatory, and were required to be returned, that he would refuse despite repeated requests to return the wrongfully seized items in order to create the highest possible level of stress on Kevin Brown.

300.    Lambert acted with knowledge that his refusal to return the seized property, (which under the law he was obligated to return) created a high risk that Kevin Brown would commit suicide, and that Kevin's suicide was a foreseeable result of his continued refusal to return the seized property.

301.    With deliberate disregard of the high risk of suicide, Lambert retained and refused to return the illegally seized property.

302.    Lambert acted with the express purpose of increasing stress and mental suffering.

303.    Lambert's conduct in wrongly seizing property, in wrongly retaining and refusing to return property, was a substantial factor in causing the death of Kevin Brown.

304.    It was clearly foreseeable and was actually foreseen by Lambert, that his wrongful refusal to return the property would cause Kevin Brown to commit suicide.

305.    Kevin Brown hung himself as a result of an irresistible impulse triggered by anxiety, depression and pain engendered by the wrongful conduct of Lambert and DOES 1-50 as set forth in this complaint.

306.    Defendant Lambert and DOES 2-50 acted unconstitutionally as set forth herein in a) obtaining a warrant through false statements and material omissions; b) executing an overbroad and manifestly illegal warrant; c) executing that warrant in an unconstitutional manner, deliberately seizing thousands of items

beyond the scope of the warrant; d) retaining the illegally seized items, and all other items which upon review were clearly neither evidence of, nor fruits of crime; e) falsely stating to Kevin Brown and others that he intended to arrest Kevin Brown, even though there was no probable cause for such an arrest; f) illegally seizing and retaining the property of the Browns and lying regarding arresting Mr. Brown, for the purpose of causing mental suffering and increased stress to Kevin Brown with knowledge of the likelihood that the foreseeable result would be Kevin Brown's suicide.

307.   Defendant Lambert and DOES 2-50 were aware that their conduct had as a foreseeable consequence, the death by suicide of Kevin Brown. They knew this because a) Lambert had access to seized medical records showing longstanding mental health conditions of anxiety disorder, depression, and insomnia; b) multiple witnesses had told him of Mr. Brown's anxiety and stress; c) Rebecca Brown had reported Kevin Brown's suicidal ideation and her fears; d) John Blakely reported specific incidents relating to possible and imminent suicide by Kevin Brown.

308.   Lambert was aware that his continued retention of illegally seized evidence would cause Kevin Brown to believe that he would be arrested, imprisoned pending trial, and subjected to abuse in the jail facilities because of Kevin's previous employment with S.D.P.D.

309.   Knowing of the likely effects on Kevin Brown with the intent to exacerbate his anxiety and stress, and with the death by suicide of Kevin Brown clearly foreseeable as of October 1, 2014, Lambert deliberately refused the return of seized property to the Browns.

310.   Upon the foreseeable death by suicide of Kevin Brown, S.D.P.D. then announced that the case had been solved, and that preparations were being made to arrest Mr. Brown when he died, even though this statement was not true.

311.   By acting at minimum with deliberate indifference, the conduct of Lambert and DOES 2-50 as set forth herein was a substantial factor in causing the death of Kevin Brown.

312.   Kevin's suicide was the consequence of an irresistible urge to kill himself to escape the pain, constant anxiety and obsessive worry that conduct of Lambert and DOES 2-50 caused to him.

## SIXTH CAUSE OF ACTION

### DEPRIVATION OF FIRST AND FIFTH AMENDMENT RIGHT TO INTIMATE FAMILIAL ASSOCIATION (42 U.S.C. § 1983) (BY PLAINTIFF REBECCA BROWN AGAINST DEFENDANTS LAMBERT AND DOES 2 - 50)

313.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

314.   By acting at minimum with deliberate indifference to the reasonably foreseeable consequence of suicide, Lambert and DOES 1 - 50 deprived Rebecca Brown of her right to intimate familial association warranted by the First and Fifth Amendments of the United States Constitution, and made applicable to the state entity, San Diego, and its official Lambert through the Due Process Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof.

2) For punitive damages.

3) For reasonable attorneys' fees, expenses and costs of suit.

4) For any other relief that is just and proper.

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **JURY DEMAND**

Pursuant to the Seventh Amendment of the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial by this action.

DATED: June 8, 2016                          Respectfully submitted,

IREDALE AND YOO, APC

s/ *Eugene Iredale*

Eugene G. Iredale
Julia Yoo
Grace Jun
Attorney for Plaintiffs