# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF KEVIN BROWN by
its successor in interest Rebecca Brown,
and REBECCA BROWN, an individual,

Plaintiffs,

v.

MICHAEL LAMBERT, an individual,
MAURA MEKENAS-PARGA, an
individual, and DOES 2-50,

Defendants.

Case No.:  15-cv-1583-DMS (WVG)

**_AMENDED_ ORDER (1) GRANTING
IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND (2)
GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

This case stems from the 1984 murder of 14 year old Claire Hough. Claire's body was found in the early morning hours at Torrey Pines State Beach. She had been brutally beaten, strangled to death, and mutilated with a knife. The case was reopened after having gone unsolved for decades. Through advancement in DNA technology the San Diego Police Department ("SDPD") Crime Lab was able to perform further tests in 2012. DNA from a convicted rapist, Ronald Tatro, was found in blood from the victim's clothing. In addition, a combined sperm fraction taken from a vaginal swab from the victim's body revealed trace amounts of semen from a second individual, Kevin Brown, who was a

former longtime employee of the Crime Lab and employed by the Lab at the time of Claire's murder.

Plaintiffs claim Brown's DNA was present through an obvious case of cross contamination, likely due to now-outdated standards used in the Lab in the 1980s when swabs were air dried in the open and DNA science was not developed. Plaintiffs point out that it was common practice at that time for Lab employees to use their own semen samples or samples from their coworkers for testing reagents in the Lab and, as a result, several Lab employees believed the positive hit on Brown's DNA was due to cross contamination. Plaintiffs contend Defendant Michael Lambert obtained a warrant to search Brown's residence by misrepresenting and omitting these and other material facts in an affidavit submitted to a state judge in support of the application for a search warrant. Plaintiffs allege that after Defendants obtained the warrant, they engaged in a dragnet search of Brown's home and put extreme pressure on an emotionally fragile Brown, ultimately resulting in a number of constitutional violations and Brown's death by suicide.

Before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for partial summary judgment. Defendants seek summary judgment on each of Plaintiffs' claims, while Plaintiffs seek partial summary judgment on two of their claims. The motions came on for hearing on April 21, 2017. Eugene Iredale appeared and argued for Plaintiffs, and Catherine Richardson appeared and argued for Defendants.[1]

The Court issued its original Order on the parties' motions on May 25, 2017. In that Order, the Court denied Defendants' motion and granted in part and denied in part Plaintiffs' motion. Specifically, the Court granted Plaintiffs' motion on their third claim for unlawful seizure beyond the scope of the warrant and denied the motion on Plaintiffs' fourth claim.

/ / /

---

[1] After the motion was submitted, Defendants filed a Notice of Supplemental Authority in support of their motion, which the Court has considered. (*See* Docket No. 71.)

Twelve days after the Order was issued, Defendants filed a Notice of Interlocutory Appeal. The following day, June 7, 2017, Plaintiffs filed an *ex parte* motion to certify the appeal as frivolous. The Court held a hearing on that motion on June 9, 2017, and at that hearing set a further briefing schedule on the motion. After those further briefs were submitted, the Court held another hearing during which Defendants agreed to withdraw their Notice of Appeal to allow the Court to address the important issues raised in the parties' supplemental briefs and discussed at the hearings. This order addresses those issues.

# I.

# BACKGROUND

Following the discovery of Claire's body, an autopsy was conducted by a pathologist from the San Diego County Coroner's Office. The pathologist concluded the cause of death was manual strangulation, and noted a deep laceration to Claire's throat, blunt force injuries to her face, and stab wounds to her chest and genitalia. Her entire left breast had been amputated, and her mouth was filled with sand. Numerous items of evidence were collected from the scene, many of which were stained with blood. (Pls.' Opp'n to Defs.' Mot., Ex. 15, Evidence Screen at 3-4, 6-9.[2]) Other items of evidence were swabbed to detect the presence of semen. (*Id.* at 3, 6.) Vaginal, anal and oral swabs were also taken from the victim.[3] (*Id.* at 1.) The autopsy, which was performed the day after Claire's body was discovered, found "[n]o spermatozoa" on the oral, anal and vaginal smears taken from the victim. (Pls.' Opp'n to Defs.' Mot., Ex. 12 at 4.)

Following the initial investigation, no eyewitnesses were identified, few leads were developed, and Claire's case went cold for nearly two decades. The case was revisited several times by the SDPD Cold Case Team. Finally, in 2012 a Detective from the Cold

---

[2] The page number cited refers to the page number of the exhibit.

[3] There is a dispute about the number of vaginal swabs that were taken from the victim. In one report, Evidence Technician Randy Gibson reported receiving only one swab, but other reports document the presence of "swabs."

Case Team submitted a lab request to reexamine the physical evidence in the case with the hope that new DNA technology would yield positive results. The Detective specifically requested the SDPD Crime Lab reexamine the vaginal swabs, a towel recovered from the scene and Claire's clothing.

Criminalist David Cornacchia conducted the DNA analysis of this evidence, along with other items of evidence from the case. (Pls.' Opp'n to Defs.' Mot, Ex. 25.) Non-sperm fractions of blood stains on Claire's jeans identified Tatro as a match. (*Id.* at 4.) Tatro was also identified as a possible contributor to non-sperm fraction stains on Claire's underwear. (*Id.* at 6.) In addition, DNA analysis of a sperm fraction of the combined vaginal swab extracts returned a hit to Brown.[4]

At the time of Claire's murder, Brown was thirty-two (32) years old, single, and worked as a criminalist in the SDPD Crime Lab. At that time, it was common practice for male criminalists working in the Lab to use their own semen samples or samples from their male coworkers to test the reliability of reagents used in detecting the presence of acid phosphatase, an enzyme present at high levels in sperm, and in microscopic examinations to identify sperm. (Pls.' Opp'n to Defs.' Mot., Ex. 14 at 27; Ex. 18 at 15; Ex. 19 at 19; Ex. 20 at 14.)

Around the time Cornacchia reported the results of his DNA analysis, Defendant Lambert, a detective with the SDPD, began investigating Claire's murder. In the course of that investigation, Lambert read Claire's case file and discussed the case with numerous witnesses, including Cornacchia, John Simms, James Stam, Jennifer Shen and a number of other individuals who previously worked with Brown in the Crime Lab. Brown left the Crime Lab in 2002, after many years of service. (Defs.' Mot., Ex. T at 24.)

---

[4] A third individual, Mark Wilkinson, also was identified from a sperm fraction on Claire's underwear. Wilkinson was Claire's boyfriend but was eliminated as a suspect as he was not in San Diego at the time of the murder. He lived in Rhode Island. Claire also lived in Rhode Island, and was visiting her grandparents in San Diego at the time of her murder.

Simms tested some of the evidence from Claire's case shortly after the murder. At his deposition in this case, Simms testified he told Defendant Lambert there was a possibility he "could have done" something while "working on the evidence that might have resulted in possible contamination" of the evidence with Brown's semen sample, "that there was a possibility." (Pls.' Opp'n to Defs.' Mot., Ex. 14 at 76.) (*See also id.* at 87 (stating Simms told Lambert he had "concerns about a breach of protocol that [he] may have committed that might have led to possible contamination."))

Stam, one of Brown's former supervisors in the Crime Lab, also testified in his deposition in this case that he told Defendant Lambert he believed "contamination" was a more likely explanation as to why Brown's DNA was found on the evidence from the Hough case. (Pls.' Opp'n to Defs.' Mot., Ex 18 at 26.) He tried "to convince Detective Lambert that you need to look at the contamination first. That needs to be the No. 1 thing. You need to eliminate that 100 percent and then maybe go on with the rest of it." (*Id.* at 30.)

It is unclear when Defendant Lambert had these conversations with Simms and Stam. However, Cornacchia testified at his deposition in this case that he informed Lambert about the male criminologists' practice of using their own semen samples no later than November 2013, before Lambert applied for the search warrant in this case. (Pls.' Opp'n to Defs.' Mot., Ex. 24 at 59) (stating no later than November 2013, Cornacchia "discussed with Detective Lambert issues concerning the presence of semen samples from analysts in the lab being something that happens.")

On January 3, 2014, Defendant Lambert applied for a search warrant for Brown's home, which Brown then shared with his wife Rebecca Brown and Rebecca's mother and brother. In the search warrant affidavit, Lambert recounted the facts surrounding Claire's murder and the initial investigation. (Defs.' Mot., Ex. C.) He also recounted the cold case investigations that began in 1996. He also went over DNA evidence and analysis, in general. Absent from the affidavit, however, was any discussion of the now-outdated

lab practices in 1984, which were considerably different from 2012 practices when the DNA analysis in this case was conducted.

The affidavit then turned to the DNA analysis of the evidence in Claire's case, and explained that through that analysis, two suspects were identified. The first was Tatro. Lambert set out Tatro's criminal history prior to Claire's murder, which included convictions for rape and battery, and stated after Claire's murder, Tatro was also convicted of the attempted rape of a teenage girl in La Mesa, California. Tatro was also a person of interest in the February 1984 murder of prostitute Carol Defleice.[5] The second suspect identified through the DNA analysis was Brown. As noted, Brown was identified through analysis of a combined sperm fraction (where DNA is extracted from sperm cells) from the vaginal swab taken from the victim.

In the affidavit, Lambert stated Brown was a former employee of the SDPD Crime Lab, but he failed to inform the judge of the male lab employees' practice of using their own semen samples or samples from their coworkers in testing reagents in the Lab. Rather than raising the possibility that the vaginal swab may have been contaminated in the Lab by Brown's semen sample, Lambert stated Jennifer Shen, then the manager of the Lab, stated, "BROWN had no access to the evidence in the HOUGH murder" and "that cross contamination is not possible." (Defs.' Mot., Ex. C at 17.) This statement was made despite numerous documented instances of contamination in the Crime Lab. (Pls.'

---

[5] There is no dispute about Tatro's criminal history, and it reflects a longstanding campaign of brutal violence against women. The 1974 rape involved Tatro luring a young woman into his car, placing her in the trunk and then raping her at knifepoint while threatening to kill her. (Pls.' Opp'n to Defs.' Mot., Ex. 26 at LAMBERT 004532-34.) The incident in La Mesa involved Mr. Tatro offering to help a 16 year old girl who was having car trouble, and once she was in his car, using a stun gun or some other electrical device to shock her. (*Id.* at LAMBERT 004310-11.) When Tatro was apprehended for that crime, (he was found naked in the back of his van with his wrists slit), the officers confiscated a pornographic magazine depicting photos, stories and devices relating to bondage and sadomasochism as well as a blood stained paring-type knife. (*Id.* at LAMBERT 004321.)

Opp'n to Defs.' Mot. at 19-22) (listing twenty (20) instances of cross contamination)). Lambert also failed to disclose to the judge that the autopsy analysis of the vaginal swab in 1984 was negative for sperm.

Defendant Lambert then recounted in the affidavit his investigation into Brown, which revealed that prior to getting married and while working in the Lab, Brown talked about going to strip clubs. Lambert also recounted Brown's nickname in the Lab was "Kinky," and other lurid stories about Brown from his coworkers. Lambert then concluded, based on the 2012 DNA analysis of the vaginal swab, that "Kevin BROWN had sexual intercourse with 14 year old Claire HOUGH." (*Id.* at 29.) Despite failing to find any evidence linking Tatro and Brown, the affidavit identified Brown as a suspect in Claire's murder, together with Tatro.[6] Lambert stated, "I believe the sexual intercourse Brown had with Claire [] was not consensual and appears to be contemporaneous to the murder." (*Id.* at 30-31). Lambert's theory was that Brown and Tatro were "the perpetrators, acting in concert, in the commission of the sexual assault, mutilation, and murder of Claire HOUGH," (*id.* at 4), and stated the search warrant was an "attempt to obtain information to link" Brown and Tatro. (*Id.*) Lambert also sought the warrant "to find evidence that Kevin Brown is following this case, and another similar 1978 murder of a teenage girl Barbara NANTAIS." (*Id.* at 3.)

The search warrant affidavit requested permission to seize ten (10) categories of evidence, including: (1) "Newspaper clippings or any other print news relating to the murders of Claire HOUGH and/or Barbara NANTAIS[,]" (2) "Address books, diaries/journals, hand written in nature[,]" (3) "San Diego Police Department Crime Case Reports and/or Arrest Reports relating to Sexual Assaults[,]" (4) "Magazine, videos, … books photographs or other written or photographic evidence depicting or related to teenage or preteen pornography, rape, bondage, and sadomasochism[,]" (5) "Receipts for storage facilities including offsite storage, safety deposit boxes and 'cloud' storage[,]" and

---

[6] Tatro died in 2011, leaving Brown as the only suspect.

(6) "Photographs, disposable cameras, negatives, photographic film that relate to Claire HOUGH, Ronald TATRO, James ALT, or Barbara NANTAIS." (*Id.* at 2-3.) Lambert also requested permission to seize "Papers, documents and effects tending to show dominion and control" over the premises, (*id.* at 2), though it was well known the Browns lived in the home. (Pls.' Opp'n to Defs.' Mot., Ex. 27 at 91.) Lambert presented his affidavit in support of the warrant to a district attorney, who reviewed it and did not offer any changes or corrections. (Defs.' Mot., Ex. G at 117.) Based on Lambert's affidavit, the judge issued the warrant.

The warrant was executed six days later on January 9, 2014. On that day, prior to executing the warrant, the officers scheduled to participate in the search attended a meeting at police headquarters. (Pls.' Opp'n to Defs.' Mot., Ex. 27 at 95.) During that meeting, Lambert conducted a search warrant briefing during which he told the detectives he wanted them to seize every videotape in the house. (Pls.' Mot., Ex. 5 at 96.)

It is unclear what time the search began and what time it ended. It is also unclear how many officers were involved in the search.[7] However, the evidence reflects Defendant Lambert participated in the search as did Defendant Maura Mekenas-Parga, another SDPD Detective, (Pls.' Opp'n to Defs.' Mot., Ex. 27 at 95), and that they both made decisions about what items would be seized. (Pls.' Opp'n to Defs.' Mot., Ex. 29 at 44-45.) Defendant Mekenas-Parga testified at her deposition in this case that it was her understanding the warrant allowed for the seizure of all photographs the officers deemed as "possible evidence." (*Id.* at 53.) She also testified the warrant allowed the officers to seize "all VCR tapes." (Pls.' Mot., Ex. 4 at 78-79.) Mekenas-Parga testified her reading of the warrant allowed for seizure of "anything recording." (*Id.* at 80.) According to Mekenas-Parga, "any cell phone in the house could be seized," "any thumb drive in the house could be seized." (*Id.* at 84.) Mekenas-Parga also testified "any newspaper article,

---

[7] At oral argument, Plaintiffs' counsel represented thirteen (13) officers may have participated in the execution of the warrant, but there is no evidence to that effect.

regardless of what it said or the date … was legitimately subject to seizure[.]" (*Id.* at 113.) Notably, Mekenas-Parga did not "review any of the items in" certain boxes "to see if they could be removed and left because they had nothing to do with anything permitted to be seized in the warrant[.]" (*Id.* at 89.) She also did not review any of the photo albums before they were removed from the house. (*Id.* at 91.)

In all, the officers seized fourteen (14) boxes from the Browns' home. (Defs.' Mot., Ex. O.) The items seized included: (1) "Papers Christmas Letter w/cabin info folder[,]" (2) "Binder 'chemical imbalance' mental health problems[,]" (3) Kevin Brown's SDPD badge, (4) seven boxes of photos, journals, books, photo albums, paperwork, (5) other loose photos and photo albums, (6) a "callback roster from June 1998 for" SDPD, (7) handwritten cards, (8) notebooks, (9) a drama program from Mater Dei dated March 1, 2013,[8] (10) a file folder titled, "Apple Products," (11) a file folder titled, "Business Folder," and (12) a file folder titled "Divorce Annulments[.]" (Defs.' Mot., Ex. E.) (*See also* Decl. of Rebecca Brown in Supp. of Pls.' Mot., Exs. A-B.)

Detective Lambert testified he completed his review of the evidence seized from the Browns' home approximately three months after the seizure, or in April 2014. (Defs.' Mot., Ex. G at 127.) None of the evidence he reviewed "had any probative value to prove that Kevin Brown had committed the" murder of Claire Hough. (*Id.*) Nevertheless, Lambert did not return the property to the Browns at that time. (*Id.*) Instead, Rebecca Brown began inquiring of Lambert about the return of their property. She specifically asked about her computer, which was returned to her two weeks thereafter. (Defs.' Mot., Ex. H at 126.) Approximately three months after that, she inquired of Lambert when the rest of their property would be returned. (*Id.* at 127.) Lambert's response was, "it's all coming back soon[.]" (*Id.*)

After another month passed without the return of their property, Rebecca Brown again phoned Defendant Lambert to inquire. (Pls.' Opp'n to Defs.' Mot., Ex. 32 at 73.)

---

[8] Rebecca Brown is a high school teacher at Mater Dei High School.

As before, Lambert told her they would "be getting it all back soon." (*Id.*) The Browns believed that once their property was returned, "that it would be over." (*Id.* at 75.) Kevin Brown, in particular, was "fixated on the issue of the return of the property." (*Id.*) "He started putting a calendar in his closet in June when the detective said, it's coming back soon. So he would mark off each date until it was going to happen." (*Id.* at 76.)

After the search was conducted, and while the Browns were waiting for the return of their property, Kevin Brown began experiencing increased anxiety. (*Id.* at 43.) Brown first began suffering from anxiety disorder in high school. (*Id.* at 36.) His insomnia worsened. (*Id.*) Rebecca Brown testified that her husband was depressed. (*Id.* at 46.) "He had difficulty getting out of bed. He lost 25 pounds. His hands started shaking. He started looking older. He had me take him to Urgent Care a couple of times because he was anxious." (*Id.*) On September 26, 2014, Rebecca Brown came home from work and found her husband in bed. (*Id.* at 62.) She said he "was groggy. There was a bullet on the floor next to the bed, and he said he'd written me a letter." (*Id.* at 62-63.)

After the September 26, 2014 incident, Rebecca Brown's brother John Blakely removed all the guns from the Brown household because "it was clear to [him] that something bad was happening" with them. (Defs.' Mot., Ex. Q at 16.) That was the second time Mr. Blakely removed the guns from the house after the search warrant was executed. (*Id.*) Mr. Blakely informed Defendant Lambert he had removed the guns from the house, and did so again after the incident on September 26, 2014. (*Id.*) Later that week, Lambert went to Rebecca Brown's workplace to conduct a welfare check on her. Brown testified that during that meeting, she told Lambert her husband "might kill himself." (*Id.* at 107.) Lambert denies Rebecca Brown shared that concern with him. (Defs.' Mot., Ex. G at 148.) Less than one month later, Kevin Brown committed suicide by hanging himself from a tree at Cuyamaca State Park. (Third Am. Compl. ("TAC") ¶ 244.)

On July 16, 2015, Rebecca Brown filed the present case on behalf of herself and Kevin Brown's Estate. A Second Amended Complaint ("SAC") filed on October 5, 2015,

named only Lambert as a Defendant, and alleged claims for (1) execution of a warrant obtained in violation of *Franks v. Delaware*, (2) execution of an overbroad warrant, (3) seizure of property beyond the scope of the warrant, (4) wrongful detention of, and refusal to return, seized property, (5) wrongful death under 42 U.S.C. § 1983, and (6) deprivation of right of familial association.  On June 8, 2016, Plaintiffs filed the TAC, which realleges the claims in the SAC and adds Maura Mekenas-Parga as a Defendant.

## II.

## DISCUSSION

As stated above, both sides move for summary judgment in this case.  Plaintiffs move for partial summary judgment on claims three and four only, and Defendants move for summary judgment on all of Plaintiffs' claims.

### A.  Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of demonstrating that summary judgment is proper.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate.  *Celotex*, 477 U.S. at 324.  The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations.  *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  Instead, it must designate specific facts showing there is a genuine issue for trial.  *Id.  See also Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 958 (9th

15-cv-1583-DMS (WVG)

Cir. 2004) (stating if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.** *Franks* **Claim**

In their first claim, Plaintiffs allege Defendant Lambert violated their Fourth Amendment rights when he obtained the search warrant for the Brown home through the use of "false statements, and deliberate material omissions." (Third Am. Compl. ¶ 249.) This claim is based on *Franks v. Delaware*, 438 U.S. 154 (1978), wherein the Court "established a criminal defendant's right to an evidentiary hearing when he made a showing of deliberate or reckless disregard for the truth in a search warrant affidavit and demonstrated that but for the dishonesty, the affidavit would not support a finding of probable cause." *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997). Although this standard was established in a criminal context, it "'also defines the scope of qualified immunity in civil rights actions.'" *Id.* (quoting *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991)) (quotation marks omitted). To survive summary judgment on a *Franks* claim of judicial deception, a Section 1983 plaintiff must "(1) establish that the warrant affidavit contained misrepresentations or omissions material to the finding of probable cause, and (2) make a 'substantial showing' that the misrepresentations or omissions were made intentionally or with reckless disregard for the truth." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1087 (9th Cir. 2011). "If these two requirements are met, the matter must go to trial." *Id.* (citing *Liston*, 120 F.3d at 973). *See also Hervey v. Estes*, 65 F.3d 784, 788-789 (9th Cir. 1995) (stating to survive motion for summary judgment on the ground of qualified immunity plaintiff must make a substantial showing of deliberate falsehood or reckless disregard for the truth and establish that, "but for the dishonesty, the challenged action would not have occurred."). Defendants argue these elements are not met here, therefore they are entitled to summary judgment.

In support of this argument, Defendants address a number of alleged omissions and misrepresentations in Lambert's affidavit in support of the warrant. As for omissions, Defendants admit Lambert omitted that the autopsy report concluded "No spermatazoa noted" in the oral, anal and vaginal smears taken from the victim. (Pls.' Opp'n to Defs.' Mot., Ex. 12 at 4.) Defendants also do not deny Lambert failed to disclose that a few days after the autopsy, Simms analyzed vaginal swabs taken from the victim and, consistent with the autopsy results, found no evidence of sperm. (Pls.' Opp'n to Defs.' Mot, Ex. 14 at 44-52.) Lambert also failed to disclose that the pathologist performing the autopsy did not find any physical trauma consistent with rape, or make any findings that Claire was raped or engaged in sexual intercourse before her death. Defendants also do not deny that Lambert failed to disclose the information he received from Cornacchia that male analysts working in the SDPD crime lab, like Brown, used their own semen samples when testing reagents for acid phosphatase. (Pls.' Opp'n to Defs.' Mot., Ex. 24 at 59.) Lambert also failed to disclose that Stam, Brown's former supervisor, told Lambert he believed "contamination" was a "more likely explanation" as to why Brown's DNA was found on the victim's vaginal swab. (Pls.' Opp'n to Defs.' Mot., Ex. 18 at 26.)[9] Finally, Defendants admit Lambert omitted that despite a lengthy investigation, there was no evidence of any connection between Brown and Tatro.

On the issue of misrepresentations, Defendants deny Lambert made any, but for the purpose of the present motion, the Court must construe the evidence in the light most favorable to Plaintiffs, and as so construed, there are at least three misrepresentations in the affidavit. The first is Lambert's statement that cross contamination was not possible.

---

[9] As mentioned above, there is a dispute about when Lambert had this conversation with Stam, namely whether the conversation occurred before or after Lambert submitted the application for the search warrant. Construing the facts in the light most favorable to Plaintiffs, the Court assumes this conversation took place before Lambert submitted his affidavit.

The second is the statement that Brown had no access to the evidence in the Hough case. The third is the statement that Brown had sexual intercourse with the victim.

In the affidavit, Lambert stated that SDPD Lab Manager Jennifer Shen informed him "that cross DNA contamination is not possible." (Defs.' Mot., Ex. C at 17) (emphasis in original). Despite this unequivocal statement, Shen testified she did not use "those words[,]" *i.e.*, say that cross contamination is not possible. (Pls.' Opp'n to Defs.' Mot., Ex. 22 at 136.) And contrary to the statement, Plaintiffs presented evidence of several documented instances of cross contamination by the Crime Lab. The statement that cross contamination is not possible is demonstrably false.

Next, Lambert's statement that Brown had no access to the evidence in this case created the impression that cross contamination was not possible. However, that statement is misleading given the evidence that lab employees' semen was present in the Lab and available for testing reagents even if the employee was not otherwise involved or participating in the particular investigation.

Finally, the statement that "Kevin BROWN had sexual intercourse with 14 year old Claire HOUGH[,]" (Defs.' Mot., Ex. C at 29), is a possible misrepresentation. The problem with the statement is that it is couched in absolute terms when the evidentiary foundation for the statement is questionable. The autopsy report, which was not disclosed in the affidavit and "did not make any findings as to whether Hough was raped or engaged in sexual intercourse before her death[,]" (Defs.' Mot., Ex. I at 3), contradicted that statement. Moreover, cross contamination had yet to be ruled out. The categorical statement that Brown had sex with the victim, combined with the statements from Brown's prior co-workers that he used to frequent strip clubs and his nickname was "Kinky," painted a picture of Brown as sexually deviant. The statement is misleading because it failed to inform the magistrate about the possibility that Brown's DNA was linked to the case due to cross contamination.

Construing these omissions and misrepresentations in Plaintiffs' favor, Plaintiffs have made "a substantial showing of a deliberate falsehood or reckless disregard" for the

truth.  *Hervey*, 65 F.3d at 789.  As discussed, the warrant affidavit states that "Brown had no access to the evidence in the [underlying case] and [] that cross DNA contamination is not possible."  (Defs.' Mot., Ex. C at 17.)  However, several instances of cross contamination have been documented by the Crime Lab, and the possibility (and reality) of cross contamination in crime labs is well known.  The categorical statement that cross contamination is not possible is therefore obviously false and a reasonable magistrate viewing the affidavit would know that cross contamination can and does occur.  But by stating Brown had no access to the evidence, the impression was created that cross contamination in this particular case was not possible.  The affidavit does state that "Cornacchia told [Lambert] San Diego Crime Lab employee's [sic] DNA profiles are uploaded into CODIS to identify potential cross contamination issues[,]" (*id.* at 17), but it omits critical information about how employee DNA samples, including semen and semen from Brown himself, were provided and present in the Lab for testing reagents even if the employee was not otherwise involved or participating in the particular investigation.  Some facts are "required to [be presented in an affidavit] to prevent technically true statements in the affidavit from being misleading."  *Liston*, 120 F.3d at 973.  Such is the case with the statement that "Brown had no access to the evidence[,]" as that created a false impression that contamination was not possible.  Similarly, the affidavit detailed how trace amounts of semen from Brown could be reconciled *with rape*—*e.g.*, failure to achieve full ejaculation, or low sperm count, (Defs.' Mot., Ex. C at 17), but the affidavit did not inform the magistrate about the possibility of trace amounts of Brown's semen being present due—not to sexual assault—but to cross contamination stemming from the presence of small amounts of semen in samples from Lab employees like Brown.[10]

_____

[10]  Plaintiffs presented evidence of a significant discrepancy in the miniscule number of sperm cells found in the combined sperm fractions that resulted in the identification of Brown relative to a typical male ejaculate.  According to Plaintiffs' expert, those fractions "would be roughly equivalent to 158 sperm cells, [when] … [t]he average number of

In addition, several facts were omitted from the affidavit, all of which have to do directly or indirectly with the possibility of cross contamination: Lab employees, including Brown, provided their own semen samples at that time; Lab practices were relatively lax and more prone to contamination given the undeveloped state of DNA science at that time; several Lab employees believed cross contamination was "more likely" than the possibility that Brown was complicit in murder; trace amounts of Brown's semen was consistent with cross contamination due the presence of his semen sample in the Lab; the pathologist who performed the autopsy did not find semen, nor did Simms, who analyzed a vaginal swab at the same time; the pathologist performing the autopsy did not note any physical trauma consistent with rape, or make any findings that the victim was raped or engaged in sexual intercourse before her death; and, there was no evidence linking Tatro and Brown. All of the evidence that was omitted from the affidavit tended to negate Lambert's theory that Brown was involved in Claire's murder. And all of the omitted facts were consistent with an innocent explanation for the DNA hit: cross contamination.

The omissions of these facts make the representations in the affidavit discussed above misleading by "selectively included information bolstering probable cause, while omitting information that did not." *United States v. Jenkins*, 850 F.3d 1109, 1117 (9th Cir. 2017). Plaintiffs need not establish specific intent to deceive the issuing court. *Bravo*, 665 F.3d at 1083 (citation omitted). To survive summary judgment, Plaintiffs "need only make a substantial showing of a deliberate or reckless omission, not 'clear proof.'" *Id.* at 1087 (quoting *Liston*, 120 F.3d at 974)). Drawing all inferences in Plaintiffs' favor, as the Court must at this stage of the proceedings, Plaintiffs have shown the affidavit was crafted to state facts to create a strong impression of guilt (that Brown acted in concert with Tatro to sexually assault, mutilate and murder the victim) by

_____

sperm cells in a typical ejaculate, for comparison purposes, ranges from 200,000,000 – 600,000,000." (Pls.' Opp'n to Defs.' Mot., Ex. 7 at 13.)

misrepresenting and omitting important facts. Based on the record presently before the Court, and construing the evidence in Plaintiffs' favor, Plaintiffs have made a substantial showing of deliberate falsehood or reckless disregard for the truth.

Having made that showing, it now falls to the Court to decide "whether the affidavit, once corrected and supplemented, establishes probable cause." *Bravo*, 665 F.3d at 1084 (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009)). *See also Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) ("Materiality is for the court, state of mind is for the jury.") "If probable cause remains after amendment, then no constitutional error has occurred." *Bravo*, 665 F.3d at 1084.

The affidavit, once corrected and supplemented, lacks probable cause to search Brown's home. "Officers have probable cause for a search when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause that Brown murdered the victim in concert with Tatro and that evidence of the crime would be found in the home rested squarely on the theory that Brown had sexual intercourse with, and raped, the victim. The affidavit declared as much, and did so on the strength of the DNA evidence. But the evidentiary value of the DNA evidence is highly suspect when all the facts are known. When, as here, lab employees themselves suspect contamination and urge elimination of that possibility before proceeding, a DNA "hit" quickly descends from extremely damning to highly questionable evidence, unless and until contamination can be ruled out. Other than the DNA evidence the affidavit here relies on lurid stories and a pejorative nickname to bolster probable cause. That, of course, is not sufficient to warrant a reasonable person to believe that the suspect committed rape and murder and that evidence of those crimes will be found in his

/ / /

/ / /

/ / /

17

residence. A reasonable magistrate presented with all of the information would not have issued the warrant. *Liston*, 120 F.3d at 975.[11]

In light of these findings, Defendants are not entitled to summary judgment on Plaintiffs' first claim. At trial, Plaintiffs will have to convince a jury that Lambert deliberately or recklessly omitted the foregoing facts and included the misleading statements in the affidavit. *See Hervey*, 65 F.3d at 791. "That is a factual determination for the trier of fact." *Id.*

## C. Overbroad Warrant

Plaintiffs' second claim alleges the search warrant was overbroad. In response to Defendants' motion, Plaintiffs identify Clauses 2, 5 and 7 as being overbroad. Clause 2 is the "dominion and control" clause, and it allowed for the seizure of "Papers, documents and effects tending to show dominion and control over said premises …." (Defs.' Mot., Ex. C at 2.) Clause 5 allowed for the seizure of "Address books, diaries/journals, hand written in nature." (*Id.* at 3.) Clause 7 allowed for the seizure of "Magazines, videos, electronic files, books, photographs or other written or photographic evidence depicting or related to teenage or preteen pornography, rape, bondage, and sadomasochism." (*Id.*) Defendants assert the warrant was not overbroad, and even if it was, they are entitled to qualified immunity.

"A warrant must particularly describe 'the place to be searched, and the person or things to be seized.'" *Ewing v. City of Stockton*, 588 F.3d 1218, 1228 (9th Cir. 2009) (quoting U.S. Const. amend. IV). This particularity "requirement is designed 'to prevent a general, exploratory rummaging in a person's belongings.'" *Id.* (quoting *United States*

---

[11] Defendants point out that Brown made statements to law enforcement and others that they considered incriminating, including that he may have had sex with a girl visiting from out of town around the time of the murder who might have been named Claire. (Defs.' Mot., Ex. U at 3-6.) However, those statements were made after the warrant issued and after the home was searched, and thus were *not* included in the warrant affidavit and not considered by the magistrate.

*v. McClintock*, 748 F.2d 1278, 1282 (9th Cir. 1984)) (internal quotation marks omitted). The Ninth Circuit considers three factors in analyzing the breadth of a warrant:

> (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available ....

*United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015), *cert. denied*, 137 S.Ct. 36 (2016), (quoting *United States v. Lei Shi*, 525 F.3d 709, 731-32 (9th Cir. 2008)).

Here, Defendants assert the warrant was not overbroad, but they fail to show the Clauses identified above, particularly the open-ended Clause 5, were not overbroad as a matter of law. Indeed, they do not address these specific clauses at all, instead arguing generally that "[t]he warrant was specific as to the places to be searched and the items to be seized." (Mem. of P. & A. in Supp. of Defs.' Mot. at 17.) This generalized argument does not show Defendants are entitled to summary judgment on the ground the warrant was not overbroad.

Nor are Defendants entitled to summary judgment on the ground of qualified immunity. On this issue, Defendants raise two arguments. First, they suggest Lambert is entitled to qualified immunity because he presented his affidavit to his supervisor and a district attorney, and a judge then issued the warrant. (Mem. of P. & A. in Supp. of Defs.' Mot. at 16.) Given the Court's discussion on Plaintiffs' first claim, however, Lambert is not entitled to qualified immunity on the claim that the warrant was overbroad. *See Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("Moreover, because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid.")[12]

---

[12] Defendants also raise this argument in support of their request for summary judgment on Plaintiffs' third claim for relief. For the reasons stated above, the Court rejects the argument as against that claim, as well.

Next, Defendants argue Defendant Mekenas-Parga is entitled to qualified immunity because she did not personally participate in the efforts to obtain the warrant. As an initial matter, this argument goes to Plaintiffs' substantive claim, not to the issue of qualified immunity. Nevertheless, the argument is not persuasive. There is no dispute Mekenas-Parga did not assist in obtaining the warrant, but Plaintiffs' claims against her are not based on the request for and the subsequent issuance of the warrant. Rather, they are based on her execution of the warrant, namely executing a warrant that was overbroad on its face and seizing documents that went beyond the scope of the warrant. Defendants have not shown Defendant Mekenas-Parga did not personally participate in those tasks. On the contrary, the evidence reflects she was involved in the execution of the warrant and made decisions about which items would be seized. (Pls.' Opp'n to Defs.' Mot., Ex. 27 at 95; Pls.' Opp'n to Defs.' Mot., Ex. 29 at 44-45.)

In their supplemental brief in opposition to Plaintiffs' *ex parte* motion to certify the appeal as frivolous, Defendants raise for the first time another argument in support of a finding that Mekenas-Parga is entitled to qualified immunity, namely, that she, like Lambert, was entitled to rely on the magistrate's issuance of the warrant. (*See* Defs.' Supp. Br. in Opp'n to Pls.' *Ex Parte* Mot. to Certify Interlocutory Appeal as Frivolous at 9-10.) However, the Court agrees with Plaintiffs that officers who plan and lead a search, like Mekenas-Parga did in this case, "'must actually read the warrant and satisfy themselves that they understand its scope and limitations, and that it is not defective in some obvious way.'" *KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2007) (quoting *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2001)). Thus, Defendants are not entitled to summary judgment on Plaintiffs' second claim.

/ / /
/ / /
/ / /
/ / /
/ / /

## D. Unlawful Seizure of Property Beyond the Scope of the Warrant

Plaintiffs' third claim alleges Defendants seized property beyond the scope of the warrant in violation of the Fourth Amendment. [13] Both Plaintiffs and Defendants move for summary judgment on this claim, with Plaintiffs arguing Defendants seized property beyond the scope of the warrant, and Defendants arguing to the contrary.[14]

"Because 'indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adopting of the Fourth Amendment,' that Amendment requires that the scope of every authorized search be particularly described." *Walter v. United States*, 447 U.S. 649, 657 (1980) (internal citations omitted). "'[I]f the scope of the search exceeds that permitted by the terms of a validly issued warrant …, the subsequent seizure is unconstitutional without more.'" *Wilson v. Layne*, 526 U.S. 603, 611 (1999) (quoting *Horton v. California*, 496 U.S. 128, 140 (1990)). *See also United States v. Sedaghaty*, 728 F.3d 885, 915 (9th Cir. 2014) (stating government's seizure of items beyond terms of warrant violates Fourth Amendment.)

> The Supreme Court has emphasized that "there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers" as opposed to physical objects, and that given the danger of coming across papers that are not authorized to be seized, "responsible officials, including judicial officials, must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy."

---

[13] At oral argument, Plaintiffs' counsel clarified this claim applies only to the seizure of physical items and objects, such as papers and photographs. It does not encompass the seizure of computers, cell phones or other types of electronic media and devices.

[14] As an initial matter, Defendants assert in conclusory fashion that Plaintiffs lack standing to challenge the seizure and retention of items that did not belong to either Kevin or Rebecca Brown. (*See* Mem. of P. & A. in Supp. of Defs.' Mot. at 19, 20.) Plaintiffs addressed this argument in their reply brief on their *ex parte* motion to certify Defendants' appeal as frivolous, but Defendants have not had an opportunity to respond to that argument. Absent further briefing from Defendants, the Court declines to resolve the issue here. Defendants should be prepared to address the issue prior to trial, however.

*Sedaghaty*, 728 F.3d at 914 (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)). *See also United States v. Rettig*, 589 F.2d 418, 422-23 (9th Cir. 1978) ("An examination of the books, papers, and personal possessions in a suspect's residence is an especially sensitive matter, calling for careful exercise of the magistrate's judicial supervision and control.")

Here, Defendants argue in their opposition to Plaintiffs' motion that the seizure of Plaintiffs' property is subject to the test set out in *Pacific Marine Center, Inc. v. Silva*, 809 F.Supp.2d 1266 (E.D. Cal. 2011). That test states, "[w]hen considering '[w]hether a search exceeds the scope of a search warrant,' the court must engage in 'an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search.'" *Id.* at 1280 (quoting *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir.), *amended by* 298 F.3d 1021 (9th Cir. 2001)). The claim in this case, however, is not addressed to the scope of the *search*. Indeed, Plaintiffs do not appear to dispute that Defendants were authorized to search the property that was ultimately seized in this case. Rather, the claim here concerns the actual *seizure* of Plaintiffs' property, and alleges the seizure went beyond the scope of the warrant. The test set out in *Pacific Marine*, therefore, does not apply here.

The law applicable to the claim asserted here is found in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982). In that case, as here, the defendants "challenge[d] only the scope of the seizure." *Id.* at 595. There, "[w]hen the agents seized all Marubeni's records for the relevant time periods, they took large quantities of documents that were not described in the search warrant." *Id.* In response to the defendant's challenge to the seizure, "[t]he Government argue[d] that the seizure was reasonable because the documents were intermingled and it was difficult to separate the described documents from the irrelevant ones." *Id.* The Ninth Circuit was not persuaded. It stated: "It is highly doubtful whether the wholesale seizure by the Government of documents not mentioned in the warrant comported with the requirements of the fourth amendment. As a general rule, in searches made pursuant to warrants only the specifically enumerated

items may be seized." *Id.* The court acknowledged "that all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search." *Id.* However, the court also stated, "the wholesale seizure for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'" *Id.* (quoting *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980)). The court went on to state:

> In the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, we suggest that the Government and law enforcement officials generally can avoid violating fourth amendment rights by sealing and holding the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute's Model Code of Pre-Arraignment Procedure. If the need for transporting the documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alternative exists. *See United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982). The essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate. In the absence of an exercise of such judgment prior to the seizure in the present case, it appears to us that the seizure, even though convenient under the circumstances, was unreasonable.

*Id.* at 595-96.

Here, there is no dispute about what Defendants seized, namely 14 boxes of documents, four large trash bags containing Plaintiffs' property, and a suitcase. (Defs.' Opp'n to Pls.' Mot. at 9.) Within these boxes and trash bags were thousands of photographs and other items, including but not limited to: (1) Rebecca Brown's international driving permit, (2) a music folder for students, (3) Kevin Brown's mother's tax return from 2000, (4) a note from Ronald and Nancy Reagan, (5) a coaster from the Black Angus in Wiesbaden, Germany, (6) a copy of the Magna Carta, (7) a steamship

ticket from 1932, (8) Rebecca Brown's report cards, (9) 45 singles of Perry Como, Bing Crosby and Barbara Streisand and (10) a recipe for fudge. (Pls.' Mot., Ex. 5 at 124-27.) There is no dispute these items were not subject to seizure pursuant to the warrant. (*Id.*)

Nevertheless, Defendants argue the seizure of any documents outside the scope of the warrant was reasonable because it would have been too time-consuming for the officers to "go through every paper, album, journal, videotape and photograph at the home." (Mem. of P. & A. in Supp. of Defs.' Mot. at 18.) This argument is similar to that made by the Government in *Tamura*, and like the Ninth Circuit in that case, this Court rejects it. As indicated in *Tamura* and *Hillyard*, the instances in which documents are "so intermingled that they cannot feasibly be sorted on site" are "comparatively rare" and "exceptional." *Tamura*, 694 F.2d at 595; *Hillyard*, 677 F.2d at 1340. Defendants have not shown this is one of those cases.

Indeed, the only evidence offered in support of Defendants' argument is the testimony of Rebecca Brown, who when asked if she had "any idea how long it would have taken someone to go through all those photos if they did it at the scene at your house," responded, "It would have taken hours." (Defs.' Mot., Ex. G at 119.) Notably, Defendants fail to provide any evidence of how many officers were involved in executing the warrant or how long it took those officers to execute the warrant. And contrary to Defendants' assertion that it would have been too time-consuming to conduct a search of these documents prior to their seizure, it appears the officers executing the warrant did not make that attempt. Rather, Defendant Mekenas-Parga testified that when the officers came across a box of photographs, they did not "go through it." (Pls.' Opp'n to Defs.' Mot., Ex. 29 at 52-53.) Her feeling was "that there was no requirement of any review of anything before it was seized." (Pls.' Mot., Ex. 4 at 82.)

In this case, as in *Tamura*, the government agents responsible for the search "did not minimize intrusions on privacy, … but instead seized papers and records beyond those the warrant authorized." *Sedaghaty*, 728 F.3d at 914-15. On the current record, the Court concludes the seizure of the property described above, as well as other similar property,

went beyond the scope of the warrant, and was therefore unreasonable and a violation of Plaintiffs' Fourth Amendment rights.

Notwithstanding this finding, Defendants argue they are still entitled to judgment on this claim on the basis of qualified immunity. As with Plaintiffs' second claim, Defendants argue here they are entitled to qualified immunity because they did not personally participate in the seizure. As stated above, that argument goes to the merits of Plaintiffs' claim, not whether Defendants are entitled to qualified immunity. In any case, that argument is refuted by the evidence, which reflects both Lambert and Mekenas-Parga participated in the execution of the warrant. (Defs.' Mot., Ex. D at 8; Ex. G at 95.) Contrary to Defendants' argument, they are not entitled to qualified immunity from this claim. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 555 (6th Cir. 2003) ("The officers violated a clearly established constitutional right of which reasonable persons would have known—a right to be free of seizures beyond the scope of a warrant, in the absence of an exception to the warrant requirement such as the plain view doctrine."); *Demuth v. Fletcher*, No. 08-5093 (JRT/LIB), 2011 U.S. Dist. LEXIS 34638, at *32-36 (D. Minn. March 31, 2011) (denying qualified immunity on Fourth Amendment claim where "[t]he most cursory review of the materials would have revealed the inappropriateness of seizing them. A reasonable fact-finder could conclude that when executing the warrant, defendants went beyond their scope and seized materials that had not been enumerated, which a reasonable officer would not have seized.") Rather, in light of the above, the Court grants Plaintiffs' motion for summary judgment on this claim.

**E.   Wrongful Detention of Seized Property**

The next claim is that Defendant Lambert wrongfully detained Plaintiffs' illegally seized property in violation of the Fourth Amendment. As with the third claim for relief, both Plaintiffs and Defendants move for summary judgment on this claim.

As an initial matter, Defendants request that the Court dismiss this claim because it is not legally viable. (Defs.' Opp'n to Pls.' Mot. at 11.) They contend that to the extent Defendant Lambert's detention of Plaintiffs' property was wrongful, Plaintiffs' claim

arises under the Due Process Clause rather than the Fourth Amendment. Although there is case law to support Defendants' argument, *see Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999) ("the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property."), there is also case law from the Ninth Circuit to support Plaintiffs' claim under the Fourth Amendment. *See Tamura*, 694 F.2d at 597 ("The Government's unnecessary delay in returning the master volumes appears to be an unreasonable and therefore unconstitutional manner of executing the warrant.") *See also Brewster v. Beck*, No. 15-55479, 2017 U.S. App. LEXIS 10971, at *6 (9th Cir. June 21, 2017) (internal citations omitted) ("The Fourth Amendment doesn't become irrelevant once an initial seizure has run its course. A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force.") Therefore, the Court declines Defendants' invitation to dismiss this claim as improperly pleaded.

As this claim is pleaded under the Fourth Amendment, Plaintiffs can prevail on this claim only if they show Defendant Lambert's detention of Plaintiffs' property was reasonable. Neither Plaintiffs nor Defendants provide the Court with any guidance on how that issue is to be determined, but it would appear to involve "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994). *See also San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (quoting *Berger v. New York*, 388 U.S. 41, 70 (1967) (Stewart, J., concurring)) ("'the standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion.'") If that balancing test weighed in Plaintiffs' favor, then Plaintiffs will have shown a violation of the Fourth Amendment rights.

However, even if Plaintiffs made that showing, Defendants would be entitled to qualified immunity on this claim. Even though Defendants did not raise this argument initially, and despite Plaintiffs' notice of supplemental authority, (*see* Docket No. 87),

there was no precedent as of November 2014, when Plaintiffs' property was returned to Rebecca Brown, that put Lambert on "clear notice" that his continued detention of Plaintiffs' property under the circumstances was a violation of Plaintiffs' Fourth Amendment rights. *S.B. v. County of San Diego*, No. 15-56848, 2017 U.S. App. LEXIS 8452, at *15 (9th Cir. May 12, 2017). The cases Plaintiffs cite, *Tamura*, *United States v. Comprehensive Drug Testing*, 621 F.3d 1162, (9th Cir. 2010) (*en banc*), and *Brewster*, are factually distinguishable from this case, and thus not "sufficiently analogous" to give Lambert "fair notice that it was objectively unreasonable" for him to continue to detain Plaintiffs' property while he waited for (a) the District Attorney's office to review the evidence and make a decision whether to file charges against Brown, or (b) Plaintiffs to request an order from the court to release the property.[15] *S.B. v. County of San Diego*, 2017 U.S. App. LEXIS 8452, at *16. Thus, Defendants are entitled to qualified immunity on this claim.

**F.    Wrongful Death**

The next claim is for wrongful death against Defendant Lambert. In the Third Amended Complaint, Plaintiffs allege Lambert knew Brown "was deeply depressed and in danger of committing suicide" after he was accused of being involved in the death of Claire Hough. (TAC ¶¶ 288-91.) Plaintiffs allege Lambert "elected to increase" the stress on Brown, and decided he would refuse to return the property seized from Plaintiffs' home "despite repeated requests to return the wrongfully seized items in order to create the highest possible level of stress on Kevin Brown." (*Id.* ¶ 299.) Plaintiffs allege "Lambert acted with knowledge that his refusal to return the seized property …

/ / /

---

[15] California Penal Code § 1536 provides: "All property or things taken on a warrant must be retained by the officer in his custody, subject to the order of the court to which he is required to return the proceedings before him, or of any other court in which the offense in respect to which the property of things taken is triable." Cal. Penal Code § 1536.

created a high risk that Kevin Brown would commit suicide, and that Kevin's suicide was a foreseeable result of his continued refusal to return the seized property." (*Id.* ¶ 300.)

Defendants are the only parties moving for summary judgment on this claim. They argue Plaintiffs' claim actually sounds in negligence, which is insufficient to support a claim under § 1983. They also assert there was no violation of Kevin Brown's constitutional rights, and even if there was, Plaintiffs cannot establish any alleged violation caused Brown's death. Finally, Defendants claim they are entitled to qualified immunity.

Although causation is an element of Plaintiffs' wrongful death claim, the claim is clearly pleaded as a § 1983 claim, not a claim for negligence. Thus, Defendants' first argument does not warrant judgment in their favor.

Defendants' second argument also fails to show Defendants are entitled to judgment as a matter of law. This argument goes to the first element of Plaintiffs' wrongful death claim, which requires Plaintiffs to prove there was a violation of their constitutional rights. *See Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 882 (5th Cir. 2015) (quoting *Phillips ex rel. Phillips v. Monroe Cty., Miss.*, 311 F.3d 369, 374 (5th Cir. 2002)) ("'[A] plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute.'") Although Defendants argue there was no violation of Plaintiffs' constitutional rights, the above discussion with respect to Plaintiffs' third claim for seizure beyond the scope of the warrant refutes that argument. The presence of genuine issues of material fact on the *Franks* claim and the second claim for an overbroad warrant also leaves open the possibility that the jury will find other constitutional violations. Thus, Defendants are not entitled to summary judgment on the ground there was no constitutional violation here.

Defendants' third argument focuses on the element of causation. "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate

causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) Causation-in-fact is a factual determination, and proximate cause presents a mixed question of law and fact. *Id.* n.13.

Here, Defendants argue there is no evidence of proximate cause. (Mem. of P. & A. in Supp. of Defs.' Mot. at 23.) However, Rebecca Brown testified her husband was not suicidal before he became a target of the investigation into Claire Hough's murder. (Pls.' Opp'n to Defs.' Mot., Ex. 32 at 62.) She also testified he became suicidal after that time. (*Id.*) Rebecca Brown also testified she told Defendant Lambert she "was worried that maybe her husband would kill himself" after she found him "groggy" in bed with a bullet on the floor next to the bed and a handwritten note he had penned to her. (*Id.* at 62-63, 67-68.) Blakely, Rebecca's brother, also testified he twice informed Defendant Lambert he removed all the firearms from the Browns' home because "it was clear to [him] that something bad was happening" with Kevin and Rebecca Brown. (Defs.' Mot., Ex. Q at 16.) Construed in Plaintiffs' favor, this evidence raises a genuine issue of material fact on the element of causation.

Defendants raise another argument on the element of causation, namely that Brown's suicide was an intervening, superseding cause of Plaintiffs' injury such that Defendant Lambert cannot be held liable for wrongful death. However, in *Castro v. County of Los Angeles*, 797 F.3d 654 (9th Cir. 2015), *cert. denied*, 137 S.Ct. 831 (2017), the Ninth Circuit stated "[a] corrections officer will be held legally responsible for an inmate's injuries if the officer's actions are a 'moving force' behind a series of events that ultimately lead to a foreseeable harm, *even if other intervening causes contributed to the harm.*" *Id.* at 667 (citing *Conn v. City of Reno*, 591 F.3d 1081, 1100 (9th Cir. 2010)) (emphasis added). The court added, "[i]f reasonable persons could differ over the question of foreseeability, that issue should be left to the jury." *Id.* (citing *Conn*, 591 F.3d at 1100). Here, there are numerous triable issues of material fact on the element of causation, which preclude entry of summary judgment.

Defendant's final argument on the wrongful death claim is Defendant Lambert is entitled to qualified immunity. Specifically, Defendants argue the right allegedly violated here was not clearly established. According to Defendants, that right was the "right to be free from investigation[.]" (Mem. of P. & A. in Supp. of Defs.' Mot. at 21.) However, that misstates the issue. The rights at issue here do not include the "right to be free from investigation." Indeed, Plaintiffs agree there is no such right. Rather, the rights at issue here are Plaintiffs' rights under the Fourth Amendment, and with respect to those rights, "[t]he law regarding the permissible scope of a search where items in a warrant have been particularly described is hardly an uncertain and evolving area of the law." *Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir. 1985). *See also Ellertson v. City of Mesa*, No. CV-15-00765-PHX-GMS, 2016 U.S. Dist. LEXIS 2366, at *11-12 (D. Ariz. Jan. 8, 2016). ("The scope of the right to search and seize property was defined by the warrant and exceeding that scope violates the clearly established rights of the Plaintiffs. This principle has been long established."). The same may be said of the rights at issue in Plaintiffs' first claim. *Bettin v. Maricopa County*, No. CIV 04-02980 PHX MEA, 2007 U.S. Dist. LEXIS 42979, at *54 (D. Ariz. 2007) ("An officer who prepares a plainly invalid warrant that a reasonably competent officer should know was deficient is not entitled to immunity, despite the approval of the warrant by a magistrate.") Thus, Defendants are not entitled to qualified immunity from Plaintiffs' wrongful death claim.[16]

### III.

### CONCLUSION

For these reasons, Defendants' motion for summary judgment is granted in part and denied in part and Plaintiffs' motion for partial summary judgment is granted in part and denied in part. Specifically, the Court grants Defendants' motion on Plaintiffs' fourth

---

[16] Defendants' request for summary judgment on Plaintiffs' sixth claim for deprivation of First and Fifth Amendment rights to intimate familial association is based on the same arguments presented on Plaintiffs' fifth claim. For the reasons set out above, the Court rejects those arguments as against the sixth claim, as well.

claim for relief, grants Plaintiffs' motion on the third claim for relief and denies the remainder of the motions.[17]

**IT IS SO ORDERED.**

Dated:  June 23, 2017

Hon. Dana M. Sabraw
United States District Judge

---

[17]  The parties have fully briefed the issue of whether Defendants' appeal of the Court's previous order is frivolous.  Although this amended order changes the Court's ruling on Plaintiffs' fourth claim and amends the analysis of Plaintiffs' first claim, the Court expects Defendants will appeal this order.  Should they do so, and should Plaintiffs file another motion to certify the appeal as frivolous, the Court would be inclined to deny that motion.