1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF BROWN, et al.,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>MICHAEL LAMBERT, et al.,<br><br>　　　　　　　　　　　　Defendants. | Case No.:  15-cv-1583-DMS (WVG)<br><br>**ORDER DENYING DEFENDANTS'<br>MOTION FOR NEW TRIAL AND<br>RENEWED MOTION FOR<br>JUDGMENT AS A MATTER OF<br>LAW** |

　　　　This case arises out of a "cold case" investigation into the 1984 murder of 14-year-old Claire Hough.  Claire was brutally beaten, strangled to death, and mutilated with a knife.  The initial investigation failed to produce any definitive leads, and the case went cold for nearly three decades.  In 2012, the San Diego Police Department ("SDPD") Cold Case Team asked the SDPD Crime Lab to perform further tests in light of advancements in DNA technology.  Those tests revealed DNA from a convicted rapist, Ronald Tatro, in blood samples taken from Claire's clothing.  In addition, a combined sperm fraction taken from a vaginal swab from Claire's body revealed trace amounts of semen from a second individual, Kevin Brown, a former, longtime employee of the SDPD Crime Lab, who worked at the Lab at the time of Claire's murder.  As the investigation progressed and

began to focus on Brown, including the execution of a search warrant at his home and retention of property seized with the warrant, Brown committed suicide.

Plaintiffs are the Estate of Kevin Brown and Brown's widow, Rebecca Brown. Defendant Michael Lambert was the lead detective on the cold case investigation, and Defendant Maura Mekenas-Parga assisted with the execution of the search warrant at the Browns' home.  Plaintiffs alleged three claims for relief against Defendants for violation of their Fourth Amendment rights under the United States Constitution: (1) Defendant Lambert obtained a search warrant through judicial deception, (2) Defendant Lambert executed an overly broad search warrant at the Browns' home, and (3) Defendants Lambert and Mekenas-Parga seized property beyond the scope of the search warrant. Plaintiff Rebecca Brown also brought a claim against Defendant Lambert for violation of her right to familial association with her husband under the Fourteenth Amendment to the United States Constitution.  Finally, Plaintiffs sought punitive damages against Lambert.

During trial, the Court determined on Plaintiffs' motion for directed verdict that Plaintiffs established a violation of their Fourth Amendment rights as to the second and third claims (overbroad warrant and seizure beyond the scope of the warrant), thus leaving for the jury to determine only causation and damages, if any, as to those two claims.  The judicial deception and familial association claims were left entirely to the jury.

At the conclusion of the two-week trial, the jury awarded compensatory damages to Plaintiffs against Defendant Lambert on the first claim (judicial deception) and third claim (seizure beyond the scope) in the sums of $2.75 million and $250,000 for the Estate of Kevin Brown and Rebecca Brown, respectively, and $3 million to Rebecca Brown on her Fourteenth Amendment claim—for a total compensatory damages award of $6 million.  The jury also awarded punitive damages against Lambert in the sum of $40,000 to the Estate and $10,000 to Rebecca Brown.  Finally, the jury awarded Plaintiffs $1.00 each in nominal damages against Defendant Mekenas-Parga on the third claim (seizure beyond the scope).  The jury found for Defendant Lambert on Plaintiffs' second claim concerning the overbroad warrant.

Following the verdicts, Defendants filed the present motion for new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) and renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) ("JMOL motion"). Plaintiffs filed oppositions to each motion, and Defendants filed reply briefs.  Many of Defendants' arguments overlap between the two motions, and to that extent, the Court addresses those arguments in its discussion of the new trial motion.  *See Van Asdale v. Int'l Game Techs.*, No. 3:04-CV-00703-RAM, 2011 WL 2118893, at *10 (D. Nev. May 24, 2011) ("Courts apply a lower standard of proof to motions for new trial than they do to motions for judgment as a matter of law.")  Defendants' remaining arguments are addressed in the Court's discussion of the JMOL motion.

# I.

## BACKGROUND[1]

As stated, this case stems from a "cold case" investigation into the murder of 14-year-old Claire Hough in 1984.  Claire's body was found in the early morning hours at Torrey Pines State Beach in San Diego, California.

*The Autopsy.*   The day after Claire's body was discovered, an autopsy was conducted by a pathologist from the San Diego County Coroner's Office.  The pathologist concluded the cause of death was manual strangulation, and noted a deep laceration to Claire's throat, blunt force injuries to her face, and stab wounds to her chest and genitalia.  Her entire left breast had been amputated, and her mouth was filled was sand.  Numerous pieces of evidence were collected from the scene, many of which were stained with blood.  Other items of evidence were swabbed to detect the presence of semen.  Vaginal, anal and oral swabs were also taken from the victim, but "[n]o spermatozoa" were found on those smears.  (Trial Tr. at 723-24, ECF No. 200.)  Based on these findings, the pathologist

/ / /

---

[1]  The events relating to the 2012 investigation and giving rise to this litigation were disputed.  The facts set out below are based on substantial evidence presented at trial.

concluded Claire had been sexually assaulted by virtue of the stab wounds to her genitalia and the amputation of her left breast, but there was no evidence of rape.

*The 2012 Investigation.* Following the initial investigation in 1984, there were no definitive leads and Claire's case went cold for more than two decades. The SDPD Cold Case Team revisited the case several times without success. In 2012, the Cold Case Team reopened the case again, and submitted a lab request to reexamine the physical evidence with the hope that new DNA technology would yield positive results. The team requested the SDPD Crime Lab reexamine the vaginal swabs, a towel recovered from the scene and Claire's clothing. On November 1, 2012, SDPD Criminalist David Cornacchia conducted the DNA analysis of this evidence, along with other items of evidence from the case. (*Id.* at 665-66.) Non-sperm fractions of blood stains on Claire's jeans identified Tatro as a match. Tatro was also identified as a possible contributor to non-sperm fraction stains on Claire's underwear. In addition, DNA analysis of a sperm fraction of the combined vaginal swab extracts returned a hit to Kevin Brown, who had retired from the Crime Lab in 2002 after working there for more than 20 years.

Plaintiffs argued at trial that the presence of Brown's DNA was the result of "cross contamination" based on a common practice in the Crime Lab at the time of Claire's murder where Lab employees used their *own* semen samples or samples from their coworkers to test the reliability of reagents in the Lab used for detecting the presence of acid phosphatase (an enzyme present at high levels in sperm) to identify the presence of sperm on evidence taken from a crime victim. Two former Crime Lab employees, John Simms and Jim Stam, testified to the custom and habit of male analysts using their own semen standards to conduct forensic testing in 1984. (*Id.* at 246-47 (Stam); 287 (Simms), ECF No. 198.) And Stam and Brown himself informed homicide detectives that Brown maintained his semen standard in the Lab. (*Id.* at 255.)

Defendant Lambert interviewed current and former Crime Lab employees, including Cornacchia, Simms, Stam, Jennifer Shen and a number of other individuals who had previously worked with Brown in the Lab. Simms had tested some of the evidence

from Claire's case shortly after the murder in 1984.  (*Id.* at 296.)  He testified that he could not be certain he used his own semen sample because such samples "were generally available in the refrigerator" and available for "general use … by anybody in the room doing case work."  (*Id.* at 317.)  Simms told the jury he informed one of the homicide detectives that he could have used a semen sample that was not his and failed to clean his implements properly during testing, consistent with cleaning protocols required by DNA testing today.  (*Id.* at 300.)  He was concerned that he may have caused contamination, resulting in the DNA hit on Brown.  (*Id.* at 298-300.)

Stam, one of Brown's supervisors in the Crime Lab, also testified that he told Defendant Lambert he believed contamination was a more likely explanation as to why Brown's DNA was found on the evidence in Claire's case.  He told Lambert, "Kevin didn't do it, it is contamination.  And that until you can eliminate the contamination you can't go anywhere further with this." (*Id.* at 252.) Like Simms, Stam testified that looking into the possibility of contamination was important because the way criminalists handled evidence in the 1980s was not suited for DNA testing in 2012.  (*Id.* at 253-55 (Stam); 281 (Simms).)

It is disputed whether Defendant Lambert had these conversations with Simms and Stam before he obtained the search warrant for the Browns' home.  However, Cornacchia testified that within two to three months after November 1, 2012, when he found Brown's DNA on the vaginal swab, he spoke to Lambert about the practice of male analysts using their own semen samples at the Lab.  (*Id.* at 669, ECF No. 200.)  He stated he did not know "when exactly" the conversation took place but he estimated it occurred within two to three months after November 1, 2012, and "certainly" within one year of that date, November 1, 2013, which was well before the search warrant issued.  (*Id.* at 678-79.) Cornacchia's prior deposition testimony was consistent with his trial testimony and it was read to the jury.

*The Search Warrant Affidavit.*  On January 3, 2014, Defendant Lambert applied for and obtained a warrant to search the Browns' home.  (*Id.* at 725, 730.)  In the search

warrant affidavit, Lambert recounted the facts surrounding Claire's murder, initial investigation, and subsequent cold case investigations that began in 1996. The affidavit set out the DNA analysis of the evidence in Claire's case, and explained that through that analysis, two suspects were identified. The first was Tatro. Lambert set out Tatro's criminal history, which included convictions for rape, battery, and attempted rape of a teenage girl in La Mesa, California, and noted Tatro was a person of interest in the February 1984 murder of a prostitute. The second suspect identified through the DNA analysis was Brown.

Lambert stated in the affidavit that Brown was a former employee of the SDPD Crime Lab, but he did not mention the male lab employees' practice of using their own semen samples. The affidavit stated that Jennifer Shen, then the manager of the Lab, informed SDPD that, "BROWN had no access to the evidence in the HOUGH murder" and "that cross contamination is not possible," but the affidavit did not mention that there were numerous prior documented instances of contamination in the Lab. The affidavit also did not state that the autopsy analysis of the vaginal swab in 1984 was negative for sperm.

The affidavit stated that prior to getting married and while working in the Lab, Brown talked about going to strip clubs. The affidavit recounted Brown's nickname in the Lab was "Kinky," and it set out other lurid stories about Brown from his coworkers. The affidavit then concluded, based on the 2012 DNA analysis of the vaginal swab, that "Kevin BROWN had sexual intercourse with 14-year-old Claire HOUGH."

The affidavit identified Brown as a suspect in Claire's rape and murder, together with Tatro. Lambert stated, "I believe the sexual intercourse Brown had with Claire [ ] was not consensual and appears to be contemporaneous to the murder." Lambert's theory was that Brown and Tatro were "the perpetrators, acting in concert, in the commission of the sexual assault, mutilation, and murder of Claire HOUGH," but he did not mention that there was no evidence linking Brown and Tatro. (*Id.* at 794, ECF No. 201.) There was no dispute that Tatro was involved in the crime, but he died in 2011, leaving Brown as

the only remaining suspect.  The affidavit noted that the requested search of Brown's home was an "attempt to obtain information to link" Brown and Tatro.

Lambert presented his affidavit in support of the warrant to a deputy district attorney, who reviewed it and did not offer any changes or corrections.  (*Id.* at 725, ECF No. 200.)  Based on Lambert's affidavit, the judge issued the warrant.

*Execution of the Warrant and Events Leading to Brown's Suicide.*  The warrant was executed six days later on January 9, 2014.  As many as thirteen (13) officers were involved in the search.  Defendant Lambert participated in the search as did Defendant Maura Mekenas-Parga.  Fourteen (14) boxes were seized from the Browns' home, including numerous items that plainly had no evidentiary value, including among other items, Christmas letters, Brown's SDPD badge, seven boxes of photos, journals, books, paperwork, handwritten cards and notebooks, a drama program from Mater Dei High School dated March 1, 2013, where Rebecca Brown taught, a Bible and photograph of Jesus Christ, a photograph of President Ronald Reagan, a file folder titled "Divorce Annulments," and numerous items belonging to Rebecca's mother, who was living with the Browns at that time.  (*Id.* at 738-49.)

Detective Lambert completed his review of the seized evidence in approximately April 2014, three months after the seizure.  None of the evidence he reviewed had any probative value to prove that Brown was involved in Claire's murder.  (*Id.* at 736-38.)  Lambert did not return the property to the Browns at that time as the District Attorney's Office was evaluating the case for prosecution.  Rebecca Brown began inquiring of Lambert about the return of their property.  (*Id.* at 736.)  She asked about her computer, which was returned to her two weeks thereafter.  Approximately three months after that, she again inquired of Lambert about the return of the rest of their property.  Rebecca testified that Lambert told her the property would all be coming back soon.  (*Id.* at 949-50, ECF No. 201.)  After another month passed without return of their property, Rebecca phoned Lambert and was told the property would be returned soon.  (*Id.* at 952.)  The Browns believed that once their property was returned the investigation would be over.

(*Id.* at 944.)   Kevin, according to Rebecca, fixated on the return of the property as a benchmark to clearing his name.  (*Id.*)  In June, after Lambert said the property would be returned, Kevin put a calendar in his closet to mark off each day until it happened.  (*Id.* at 950.)  During this time, Kevin continued to proclaim his innocence and he apologized to his mother-in-law for the inconvenience—as her property, too, had been seized, stating, "I didn't do anything.  I don't know why this is happening, and I am sorry it involves you."  (*Id.* at 939.)

While the Browns were waiting for the return of their property, Kevin began experiencing increased anxiety.  He first began suffering from anxiety disorder in high school.  His insomnia worsened.  Rebecca testified that her husband was depressed.  He had difficulty getting out of bed.  He lost 21 pounds from an already lean frame.  His hands started shaking.  He started looking older.  He was taken to Urgent Care at least twice because of his anxiety.  (*Id.* at 945.)  On September 26, 2014, Rebecca came home from work and found her husband in bed.  (*Id.* at 962.)  She said he was groggy.  (*Id.* at 964.)  There was a bullet on the floor next to the bed, and he had written Rebecca a letter which appeared to be a "suicide note."  (*Id.* at 964-66.)

After the September 26, 2014 incident, Rebecca's brother John Blakely, who also lived with the Browns at that time, removed all the guns from the Brown household because Kevin was not in a good state of mind.  (*Id.* at 964-65.)  That was the second time Blakely had removed the guns from the house after execution of the search warrant, and Blakely told Lambert so.  (*Id.* at 716, ECF No. 200.)  Later that week, Lambert went to Rebecca's workplace to conduct a welfare check on her.  (*Id.* at 967, ECF No. 201.)  Rebecca told Lambert not to worry about her but that he should check on Kevin, as he "might kill himself."  (*Id.*)

Plaintiffs presented evidence that Lambert was aware of Kevin's emotional fragility and fractured family relations with Rebecca's extended family, and that Lambert used that information to pressure Kevin in hopes of "sweating" a confession out of him.  (*Id.* at 718-19, ECF No. 200.)  On September 25, 2014, Lambert used a ruse on John

Blakely, telling him that "cross contamination … is not even plausible.  It, it, it cannot happen."  Lambert told Blakely that Brown knew that, and Blakely should confront him.  That evening Blakely did so in an emotional confrontation, where Brown insisted that it was contamination and Blakely accused him of lying.  (*Id.* at 962, ECF No. 201.)

The next day, September 26, 2014, Lambert interviewed Steve and Nancy Blakely, Rebecca's brother and sister-in-law.  Lambert told Nancy that there was enough evidence in the search warrant affidavit "to convince a judge to allow us to break the sanctity of someone's home."  He said there was enough evidence in there for a judge to say, "go look for what you want to look for."  In October 2014, Lambert called Pat Stengel, Rebecca's sister, and told her the investigation was coming to an end, knowing that Brown was fearful of being arrested and placed in custody.  Rebecca testified that on October 15, her sister Pat called her and John Blakely.  Pat said she had just spoken with Lambert and he told her, "now it is bye-bye Kevin."  (*Id.* at 971.)  On October 20, Kevin did not return home.  (*Id.* at 990, ECF No. 202.)  His body was found the next day.  He had committed suicide, hanging himself from a tree at Cuyamaca State Park in San Diego County.

## II.

## MOTION FOR NEW TRIAL

Defendants' new trial motion is based on Federal Rule of Civil Procedure 59(a)(1)(A), which provides:  "The court may, on motion, grant a new trial on all or some of the issues—and to any party … for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  A new trial also may be granted when the jury's verdict, if allowed to stand, would result in manifest injustice.  *Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007) (quoting *Molski*, 481 F.3d at 729).

> Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has "the duty … to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.

*Molski*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).  The court "can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party."  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citations omitted).  "But after weighing the evidence, the trial judge faces a difficult task[.]"  *Id.*

> "On the one hand, the trial judge does not sit to approve miscarriages of justice.  ...  On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases, the judge should accept the findings of the jury, regardless of his own doubts in the matter.  Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case.  If, having given full respect to the jury's finding, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial."

*Id.* at 1371-72 (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 48-49 (1973)).

Defendants raise a host of arguments in support of their motion for a new trial.  First, they argue the jury's verdict on the claims for judicial deception and seizure beyond the scope of the warrant are against the clear weight of the evidence.  Second, they argue they are entitled to a new trial on Plaintiffs' familial association claim.  Third, Defendants assert they are entitled to a new trial based on prejudicial misconduct on the part of Plaintiffs' counsel.  Fourth, Defendants contend the compensatory damages award was excessive.  Fifth, Defendants claim the punitive damages award is against the clear weight of the evidence and violates due process.  Sixth, Defendants argue the Court made several

/ / /

erroneous and prejudicial evidentiary rulings.  Seventh, Defendants assert the Court erred in its instructions to the jury.

## A.    Judicial Deception and Seizure Beyond the Scope of the Warrant

After hearing evidence for nine days, the jury returned verdicts for Plaintiffs on their claims for judicial deception and seizure beyond the scope of the warrant.  (ECF Nos. 190, 191.)  As against Mekenas-Parga, who was named as a defendant on the seizure claim only, the jury awarded Plaintiffs Rebecca Brown and the Estate of Kevin Brown nominal damages in the amount of $1 per Plaintiff.  As against Lambert, who was named as a defendant on Plaintiffs' claims for judicial deception and seizure beyond the scope of the warrant, the jury awarded Plaintiff Rebecca Brown a total of $250,000 and the Estate of Kevin Brown a total of $2,750,000 in compensatory damages.

Defendants argue the findings on these claims are against the clear weight of the evidence and will result in manifest injustice if allowed to stand.  In support of this argument, Defendants focus on the judicial deception claim.  To prove judicial deception, Plaintiffs were required to show that: "(1) Defendant Lambert submitted to a judge a warrant affidavit that contained one or more misrepresentations or omissions material to the finding of probable cause; and (2) Defendant Lambert made those misrepresentations or omissions either intentionally or with reckless disregard for the truth."   (Jury Instruction No. 14, ECF No. 187.)[2]  To show "materiality", Plaintiffs had to demonstrate "that the judge would not have issued the warrant if the false information had been excluded (or redacted) or if the missing information had been included (or restored)." (*Id.*)  The jury was further instructed that:

> probable cause exists when, under all of the circumstances known to the officer at the time the search warrant was requested of the judge, an objectively reasonable police officer would conclude there is a fair probability

---

[2]  The Jury Instruction on Judicial Deception is based on the Ninth Circuit's pattern instruction and was proposed by Defendants.

that the targeted person committed the crime in question and that items related to the crime are likely to be found in the place specified in the warrant.

(*Id.*)

Defendants go through numerous pieces of evidence in an attempt to demonstrate that Lambert did not, intentionally or with reckless disregard of the truth, make any misrepresentations or omissions material to the finding of probable cause in his search warrant affidavit. Defendants argue the evidence showed (1) Lambert did not attend the initial meeting between cold case detectives and lab personnel concerning the Hough case, (2) Lambert was told contamination was not an issue, (3) Lambert did not misrepresent the number of swabs in his affidavit, (4) Lambert did not know prior to submitting his affidavit that lab analysts used their own semen samples when working in the lab, (5) Lambert did not intentionally or with reckless disregard omit from his affidavit that there was an absence of sperm on the swabs when they were initially collected, and (6) Lambert did not misrepresent or omit from his affidavit any information about the other suspect, Tatro.

Plaintiffs dispute that the evidence established any of Defendants' asserted "facts," and more specifically dispute that any of those facts were "undisputed." Plaintiffs cite other evidence—some of which is set out above—that they contend supports their position that Lambert made material misrepresentations in his affidavit and omitted material information from his affidavit, either intentionally or with reckless disregard for the truth.

Notably, the jury found that Lambert made misrepresentations or omissions material to the finding of probable cause in his search warrant affidavit, that he did so intentionally or with reckless disregard for the truth, and that his conduct caused Plaintiffs to suffer injuries warranting damages in the amounts set out above. On this claim and the others, both sides called numerous witnesses and introduced numerous pieces of evidence. Clearly, that evidence was in conflict and "susceptible of varying interpretations and evaluations and [gave] rise to a choice of inferences, all of which could

15-cv-1583-DMS (WVG)

reasonably appeal differently to one fact finder than to another." *Canadian Ingersoll-Rand Co. v. Peterson Products of San Mateo, Inc.*, 350 F.2d 18, 25 (9th Cir. 1965).  Here, the jury interpreted and evaluated that evidence in Plaintiffs' favor.  Obviously, Defendants disagree with that interpretation of the evidence, but their disagreement does not entitle them to a new trial on these claims.  There was evidence to support both sides' position, making this a quintessential case for a jury.  This Court, having listened closely to all of the evidence, cannot say the jury's verdicts on these claims were against the clear weight of the evidence, nor does the Court have a definite and firm conviction that a mistake was committed, or that manifest injustice will result if these verdicts are allowed to stand.  Rather, the verdicts were based on substantial evidence and ought not to be disturbed.  Accordingly, Defendants' motion for a new trial on these claims is denied.[3]

**B.   Familial Association**

On the familial association claim, the jury awarded Plaintiff Rebecca Brown $3 million against Defendant Lambert.  Defendants argue they are entitled to a new trial for two reasons.  First, they assert the right to familial association does not extend to spouses.  Second, they contend Plaintiffs did not prove Lambert acted with deliberate indifference.[4]  Plaintiffs dispute both of these assertions, and also argue Defendants have forfeited their first argument.

/ / /

---

[3] For these same reasons, the Court denies Defendants' JMOL motion on the ground there was insufficient evidence to support the verdict on these claims.

[4] Defendants also raise an argument on the state-created danger doctrine, and suggest Lambert has qualified immunity from such a claim.  However, Plaintiffs did not rely on the state-created danger doctrine in this case.  Defendants' suggestion that Lambert is entitled to qualified immunity from such a claim is therefore, misplaced.  Indeed, to the extent Defendants rely on qualified immunity at all in their motion for new trial, that argument is unavailable.  *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009) (holding qualified immunity "cannot be appropriately considered on a motion for a new trial, where the issue is whether the jury's verdict is against the clear weight of the evidence.")

15-cv-1583-DMS (WVG)

Although Plaintiffs assert in their opposition to the motion for new trial that Defendant Lambert has "forfeited his contention that Plaintiff's claim fails to state a cause of action[,]" (Opp'n to Mot. at 31), they fail to cite any authority for that statement.  In their opposition to Defendants' JMOL motion, Plaintiffs cite authority for the proposition that if a party fails to raise an argument in its Rule 50(a) motion then it has waived that argument for purposes of Rule 50(b), which argument Defendants do not dispute.  But neither side cites any authority addressing the issue of waiver or forfeiture for the purpose of a motion for new trial under Rule 59 as opposed to a motion under Rule 50.

Rather than addressing this issue head-on, Defendants attempt to avoid the forfeiture issue by recasting the argument in their reply brief as one of constitutional standing, which is not subject to waiver.  However, Defendants did not mention standing in their opening brief on the motion for new trial.[5]  Moreover, this does not appear to be an issue involving standing in any event.  Other than citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and reciting the elements of constitutional standing, (Reply at 9), Defendants fail to explain how those elements are not met in this case.[6]  Instead, Defendants' argument goes to whether, as a matter of law, the right to familial association applies to spouses.

As so construed, Defendants argue they did not forfeit this defense because they raised it in their Answer and their trial brief.  (Reply at 9-10.)  Defendants are correct that they raised the defense in their Answer through a catch-all affirmative defense.  (*See* ECF No. 38 at 58) (setting out affirmative defense that "Third Amended Complaint fails to state facts sufficient to constitute a cause of action against these answering Defendants.")  However, they did not raise the defense in their trial brief.  Indeed, other than the

---

[5]  Defendants did frame this issue as one of standing in their JMOL motion but did not do so in their motion for new trial.

[6]  Even if the Court construed Defendants' argument as one of constitutional standing, it would find those elements are met here.  Clearly, Rebecca Brown suffered an injury due to the loss of her husband, the jury found that injury was caused by Defendant Lambert's conduct, and they redressed that injury through an award of compensatory damages.

generalized assertion of failure to state a claim in their Answer, Defendants never raised this issue, either in a motion to dismiss, in their motion for summary judgment, in their motions *in limine*, in their jury instructions, in their trial brief, or in their Rule 50(a) JMOL motion.

Given Defendants' failure to present this issue to the Court in the more than five years that this case has been pending, which included an appeal to the Ninth Circuit, a petition for certiorari to the Supreme Court, and a ten-day jury trial, the Court would be inclined to find Defendants have forfeited this argument. However, Ninth Circuit case law indicates Defendants may have preserved this argument by raising it in the pretrial order. *Cf. Pierce Cty. Hotel Employees & Rest. Employees Health Tr. v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1329 (9th Cir. 1987) ("Issues not preserved in the pretrial order are eliminated from the action.") (*See* Am. Pretrial Order at 5) ("Plaintiffs' Third Amended Complaint fails to state facts sufficient to constitute a cause of action against Defendants.") Accordingly, the Court will address the merits of Defendants' argument.

On the merits, Defendants argue the Ninth Circuit "has never directly held that there is a substantive due process right to the familial association with one's spouse." (Mem. of P. & A. in Supp. of Mot. at 13) (citing *Lee v. County of Los Angeles*, No. CV 16-2039 DSF (JPRx), 2018 WL 6016992, at *4 (C.D. Cal. Mar. 6, 2018). However, in *Byrd v. Guess*, 137 F.3d 1126 (9th Cir. 1998), *superseded by status on other grounds as recognized in Little v. City of Manhattan Beach*, 21 Fed. App'x 651 (9th Cir. 2001), the Ninth Circuit assumed without deciding that there is such a right. *Id.* at 1133-34 (discussing appropriate standard for wife's Fourteenth Amendment claim for violation of "liberty interest in the companionship and society" of her deceased husband). *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), also includes expansive language on the right to familial association. *Id.* at 685 (quoting *Board of Dir. v. Rotary Club*, 481 U.S. 527, 545 (1987)) (stating "'the First Amendment protects those relationships, including family relationship, that presuppose 'deep attachments and commitments to the

necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'") Numerous district courts have also concluded that there is a substantive due process right to familial association with one's spouse. *See Morales v. City of Delano*, 852 F.Supp.2d 1253, 1274 (E.D. Cal. 2012) (stating principles underlying right to familial association for parents and children "establish a constitutional basis for the right of spouses to the support and companionship of each other."); *Dean v. Sacramento County*, No. 2:13-cv-00730-JAM-KJN, 2014 WL 4377956, at *2 (E.D. Cal. Sept. 4, 2014) (denying motion to dismiss wife's Fourteenth Amendment claim based on deprivation of liberty interest arising out of familial relationship with deceased husband); *Davila v. County of San Joaquin*, No. CIV. S-06-2691 LKK/EFB, 2008 WL 3876220, at *6-7 (E.D. Cal. Aug. 20, 2008) (finding wife had standing to pursue Fourteenth Amendment claim for violation of right to companionship and society of deceased husband); *Moralez v. City of Fresno*, No. CV F 06-0224 AWI SMS, 2006 WL 8458532, at *4 (E.D. Cal. May 13, 2006) (stating plaintiffs could sue under § 1983 "for a violation of their own Fourteenth Amendment rights steaming [sic] from the loss of their familial relationship with their husband and father."); *Reyes v. County of San Joaquin*, No. CIVS040428FCDPANPS, 2005 WL 2105030, at *2 (E.D. Cal. Aug. 31, 2005) (citing *Byrd*, 137 F.3d at 1134) (stating right to familial association extends to spouses); *Cosby v. City of Oakland*, No. C-97-0267 MHP, 1997 WL 703776, at *5 n.6 (N.D. Cal. Oct. 28, 1997) ("It is undisputed that a deceased's spouse, parent or child may maintain a Fourteenth Amendment loss of companionship claim for termination of the parent-child relationship without due process of law.") *See also L.V.B. v. City of Chino*, No. EDCV 09-02223 DMG (DTBx), 2010 WL 11596566, at *1, 6-7 (C.D. Cal. Feb. 18, 2010) (finding "domestic and life partner" of the decedent could pursue "a Fourteenth Amendment due process claim for unlawful state interference in a familial relationship.")

Defendants do not address all of these cases, or how they square with their argument that spouses do not have a right to familial association. Instead, they rely on

15-cv-1583-DMS (WVG)

the district court's decision in *Lee*, 2018 WL 6016992, and take issue with *Byrd* and *Morales* on the ground those cases did not address directly whether spouses may assert claims for loss of familial association under the Fourteenth Amendment. However, Defendants' critique of those cases does not warrant a finding that the right does not exist. On the contrary, *Byrd* proceeds under the assumption that there is a such a right, and the majority of district courts in the Ninth Circuit have followed suit. This Court joins that majority and rejects Defendants' argument that Rebecca Brown cannot state a claim for loss of familial association with her husband.

Defendants' only other argument here is that Plaintiffs failed to prove Lambert acted with deliberate indifference. Here, again, Defendants cite evidence supporting their defense, but they fail to address the substantial evidence supporting Plaintiffs' claim. *See, infra,* at 19-21. Defendants have not shown the verdict on this claim was against the clear weight of evidence, and thus their motion for new trial on this claim is denied.

## C.   Attorney Misconduct

Next, Defendants argue they are entitled to a new trial because Plaintiffs' counsel engaged in misconduct. Specifically, Defendants argue Attorney Iredale made repeated references to "the City" and repeatedly referred to defense counsel as the "attorney for the City" or the "Deputy City Attorney." Defendants contend this conduct implied "to the jury that the City was in fact a defendant or would be paying any damage award[.]" (Mem. of P. & A. in Supp. of Mot. at 17.) Plaintiffs argue there was no misconduct.

The Court agrees with Plaintiffs. It was evident at trial that Defendants Lambert and Mekenas-Parga were employed by the City of San Diego Police Department during the events giving rise to this case, and they were defended by the City Attorney's Office. Defense counsel themselves made that clear at trial through their own statements and witnesses they called. At Defendants' request, the Court's voir dire covered the City of San Diego (whether any prospective juror worked for or had dealings with the City or had strong feelings for or against the City). The Court informed prospective jurors that the City is not a party, but that Defendants were formerly employed by the City. (*See*

Defendants' Proposed Voir Dire Questions, ECF No. 125.)  The parties to the case were clearly identified to the jury.  (*See* Joint Statement of the Case, ECF No. 126.)  In addition, one of Defendants' expert witnesses, Dr. Mark Zelig, a forensic psychologist, testified he had a written fee agreement with the City of San Diego and billed the City $58,000 to $60,000.  Counsel also asserted in the presence of the jury the attorney-client privilege over conversations she had with SDPD Crime Lab employee David Cornacchia.  Therefore, any reference by Plaintiffs' counsel to "the City" or the "Deputy City Attorney" was not misconduct.

Furthermore, Defendants have not shown any prejudice therefrom.  *Sahakian v. City of Glendale*, No. CV 05-7419 FMO, 2008 WL 11411720, at *2 (C.D. Cal. July 1, 2008) (quoting *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 (9th Cir. 2001)) ("To warrant a new trial on attorney misconduct grounds, the misconduct must 'so permeate the trial as to show that the jury was necessarily prejudiced.'")  Defendants attempt to show prejudice by virtue of the jury's question during deliberations on punitive damages concerning the source of payments for the compensatory damage award, which indicates the jury believed the City would pay that award.  (*See* ECF No. 189 at 7) ("Please confirm the $6M award is covered by the City of San Diego/SDPD".)  But there is no evidence that award was caused by any reference to "the City" or the "Deputy City Attorney."  On the contrary, the jury's nominal damage award of $1 against Defendant Mekenas-Parga, $6 million compensatory damages award against Defendant Lambert, and defense verdict on the overbroad warrant claim reflects thoughtful and careful consideration of the evidence against each Defendant.  Accordingly, the Court rejects Defendants' argument that Plaintiffs' counsel engaged in misconduct and denies the request for a new trial on that basis.

**D.   Compensatory Damages**

Next, Defendants argue they are entitled to a new trial because the compensatory damages award against Defendant Lambert was grossly excessive and not supported by the evidence.  Although grossly excessive damages or damages unsupported by the

evidence may be grounds for a new trial, *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (quoting *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir. 1983)), Defendants have not shown the damages award against Defendant Lambert meets those standards.

Defendants' arguments here begin with the proposition that "damages for Kevin's suicide are not recoverable." (Mem. of P. & A. in Supp. of Mot. at 18.) On the judicial deception and seizure claims, Defendants are correct. However, Plaintiffs are clearly entitled to recover damages for Rebecca's pain and suffering arising from Defendants' violations of her constitutional rights, and Kevin's pre-death pain and suffering arising from Defendants' violations of his constitutional rights. *See Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (holding plaintiffs may recover pre-death pain and suffering damages under § 1983 when death is caused by violation of federal law).

Defendants take issue with the evidence on these points, but as Plaintiffs point out, there was extensive evidence "regarding the depths of Kevin Brown's suffering between the time of the execution of the search warrant and his death." (Opp'n to Mot. at 35.) Specifically, the evidence reflected that "Kevin Brown suffered from 'chronic psychiatric disease' beginning with his suffering bullying episodes in his youth." (*Id.* at 24.) Kevin also "suffered from major depressive disorder and had multiple episodes of it." (*Id.*) After the search warrant issued and before his death, Kevin's insomnia worsened, he lost 21 pounds, and he was bullied and pilloried by family members who doubted his innocence considering the issuance of the search warrant by a judge and the tactics employed by Lambert to turn the family against him. (*Id.* at 24-25.) There was substantial evidence that Lambert took advantage of Kevin's "psychiatric history and fractured family dynamic", (*id.* at 24), in an attempt to elicit a confession from Kevin that he was involved in the brutal sexual assault, rape, mutilation and murder of a 14-year-old girl. Lambert put pressure on Brown and his family even after the search warrant failed to uncover any evidence against Brown or his association with Tatro and after Lab analysts

had warned Lambert that "Kevin did not do it" and contamination had to be ruled out. Nevertheless, Lambert told John Blakely contamination was not plausible; "it cannot happen." He told Pat Stengel the investigation is concluding and it's "bye-bye Kevin[,]" suggesting that Keven would soon be arrested. Plaintiffs argued Lambert spoke to these and other family members to incite them, provoke confrontation with Kevin, and bring the matter to a head through a confession. There was also evidence that Lambert held onto the seized property—knowing it had no evidentiary value and Kevin obsessed over it—as an additional tool to "sweat" a confession out of Brown. Instead of getting a confession, Plaintiffs argued, Lambert broke Brown and got a suicide.

There was also ample evidence of Rebecca's pain and suffering during this time. She was constantly worried about Kevin's physical and mental state, and was especially worried Kevin would harm himself after she came home from work to find him still in bed with a bullet on the floor next to him and a "suicide note." (*Id.* at 27-28.) Rebecca was so concerned about her husband that her brother twice removed all of the firearms from their home. She was his constant companion during the months and weeks leading to his suicide.

Defendants do not address this evidence in their motion. Instead, they focus on certain of Rebecca's items that were seized as part of the search, and the number of items belonging to Rebecca's mother that were also seized, and argue that evidence did not warrant a $6 million verdict. (Mem. of P. & A. in Supp. of Mot. at 19.) The evidence presented by Plaintiffs, however, was more than sufficient to sustain the jury's award of compensatory damages. Indeed, it reflects the jury thoroughly deliberated on the evidence and the claims, and awarded each Plaintiff damages commensurate with the respective pain and suffering the jury believed was caused by each Defendant. Contrary to Defendants' assertion, there is no evidence the compensatory damage awards were intended to punish Lambert or the City, or that the awards are grossly excessive or unsupported by the evidence.

///

Defendants also argue in their reply brief there was insufficient evidence that Lambert's conduct caused Kevin to commit suicide. (Reply at 14.) Defendants did not raise this argument in their motion, and thus the Court need not address it further. *See Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 563 (9th Cir. 2020) (stating argument presented for the first time in reply is forfeited). However, the Court notes that "[c]ausation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013). To the extent the Court were to consider Defendants' argument, it would find Defendants have not shown the jury's finding of causation is against the clear weight of the evidence. Rather, the jury heard substantial evidence about Brown's fear of being arrested and Lambert's attempt to pressure Brown into confessing shortly before he committed suicide. Accordingly, Defendants' arguments here do not warrant a new trial.

**E.     Punitive Damages**

Next, Defendants argue they are entitled to a new trial because the punitive damage award was against the clear weight of the evidence and excessive. The Court disagrees on both points.

First, Defendants do not address the evidence supporting the award of punitive damages in this case. They simply assert, without any citation to the record, that "Lambert's conduct did not even come close to the level of despicable conduct that subjects a person to punitive damages[.]" (Mem. of P. & A. in Supp. of Mot. at 19-20.) On the contrary, and as discussed above, there was evidence that "Lambert was aware that Kevin had been bullied in his life; he knew Kevin suffered from anxiety and depression; he was aware of fissures in Kevin's family life; and he intentionally applied pressure on Kevin Brown", (Opp'n to Mot. at 24), even though the search of the Browns' home failed to reveal any evidence connecting Kevin with the crime and even after Lambert learned that the Lab analysts used their own semen standards when working in the Lab, and thus, that contamination provided a plausible explanation for the DNA hit on Brown. (*See* Trial Tr. at 1659-61, ECF No. 204.) Accordingly, the Court rejects

Defendants' argument that the punitive damages award is against the clear weight of the evidence.[7]

The Court also rejects Defendants' argument that the punitive damages award is excessive.  Here, again, Defendants cite only the evidence that supports their argument, specifically, Lambert's stated assets and liabilities.  Defendants ignore the evidence of Lambert's annual pension of $92,710, and his limited monthly expenses.  Considering the evidence as a whole, and the amount of punitive damages ($50,000) compared to the amount of compensatory damages ($6 million), the Court declines to find the punitive damage award was excessive.

**F.   Evidentiary Rulings**

Next, Defendants argue they are entitled to a new trial based on certain of the Court's evidentiary rulings.  Specifically, Defendants assert the Court's decisions to allow evidence of (1) contamination, (2) the Lab analysts' practice of using their own semen samples in the Lab, (3) a phone call between Lambert and Kevin Brown, and (4) the continued detention of Plaintiffs' property were all erroneous and prejudicial.

"A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (citing *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir.1992)).  Here, Defendants have not shown that any of the Court's rulings were erroneous.

Defendants argue the evidence on contamination "was irrelevant to what Lambert knew when he drafted the [search warrant] affidavit[,]" (Mem. of P. & A. in Supp. of Mot. at 21), but that argument ignores that one of the alleged misrepresentations in the affidavit was Lambert's statement that "contamination <u>is not</u> possible."  It is unclear to the Court how the jury would have made the initial determination about whether that was a misrepresentation without evidence on contamination.  What Lambert knew or did not

---

[7]  For these same reasons, the Court denies Defendants' JMOL motion on punitive damages.

15-cv-1583-DMS (WVG)

know when he swore out the affidavit was also certainly relevant to the whether he acted intentionally or with reckless disregard for the truth.  As a threshold matter the jury had to determine whether Lambert's affidavit contained misrepresentations or omissions material to the finding of probable cause.  Evidence on contamination was relevant to that issue because—if credited by the jury—it undermined Lambert's assertion (and the judge's finding) that there was probable cause to believe Brown committed the crime.  To determine materiality, the jury had to consider whether the judge would have issued the warrant based on a finding of probable cause "if the false information [*e.g.,* contamination is not possible] had been excluded (or redacted) or if the missing information [*e.g.,* Lab analysts' practice of using their own semen samples] had been included (or restored)." (Jury Instruction No. 14, ECF No. 187.)

Relatedly, Defendants argue the Court erroneously admitted evidence on the Lab analysts' practice of using their own semen samples in the Lab.  As with the evidence on contamination, Defendants assert this evidence was irrelevant and should have been excluded.  However, this argument, too, ignores Plaintiffs' allegation that evidence of this practice was omitted from Lambert's affidavit.  To determine whether this was a material omission, the jury had to hear evidence on the practice itself as it was inextricably intertwined with the issue of contamination.  Defendants' argument fails to acknowledge this independent element of the judicial deception claim and focuses only on the element of Lambert's intent.  Yet, evidence of the practice was clearly relevant both to whether there was a material omission of fact and whether Lambert acted intentionally or with reckless disregard in failing to disclose that fact.  In addition, while Lambert denied knowing about the Lab analysts' practice before issuance of the warrant, he admitted learning about the practice before Brown's suicide.  Rather than pause and reassess the investigation, Lambert increased the pressure on Brown.  Among other things, Lambert told John Blakely contamination did not occur—despite contrary plausible evidence—and encouraged Blakely to confront Brown.  Thus, evidence regarding contamination and the Lab analysts' practice of using their own semen samples was intertwined and bound

15-cv-1583-DMS (WVG)

up with the claims and elements at issue, including causation.  It was highly probative on the central issues in the case and not outweighed by unfair prejudice or confusion of issues.  (*See* Fed. R. Evid. 403).  There was no error in allowing the evidence to go to the jury.

Defendants' third assertion of error concerns the admission of evidence surrounding an alleged phone call between Lambert and Kevin Brown shortly before he committed suicide.  According to Rebecca Brown, during that conversation Lambert told Kevin that the Browns' property would not be returned unless Kevin confessed.  (Trial Tr. at 989-90, ECF No. 202.)  Plaintiffs point out, however, that defense counsel did not object to this testimony, (Opp'n to Mot. at 38), which Defendants do not dispute.  Having failed to object at trial, the admission of this evidence cannot serve as the basis for a new trial unless it resulted in "plain or fundamental error … where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question."  *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001).  Defendants have not made that showing here.

In addition, the statement attributed to Lambert by Rebecca Brown is an admission and non-hearsay under Rule 801(d)(2)(A) of the Federal Rules of Evidence and was offered to show the effect of the statement on Kevin's then-existing state of mind, an exception to the rule against hearsay.  (*See* Fed. R. Evid. 803(3)).  Plaintiffs could fairly argue that statement and other conduct attributed to Lambert caused Brown pain and suffering, and led to his suicide.  Thus, the Court rejects any assignment of error on this ground.

The final contention of error concerns the Court's decision to allow evidence of Defendants' continued retention of the Browns' property.  Defendants argue this evidence was admitted in violation of Federal Rule of Evidence 403, and it "allowed the jury to find Lambert liable for Kevin's death and Rebecca's alleged damages even though such damages can only arise upon proof of a constitutional violation."  (Mem. of P. & A. in Supp. of Mot. at 22.)  Defendants assert there was no constitutional violation with respect

to Defendants' retention of the property, therefore it was error for the Court to admit this evidence.  This argument is not well taken.  Although the Court granted Defendants qualified immunity from the "wrongful retention" claim, that decision did not rest on the absence of a constitutional violation.  (*See* ECF No. 92 at 25-27.)  Rather, the Court's decision was based on the absence of case law finding this right to be "clearly established."  (*Id.*)

Moreover, this evidence was not admitted to prove the dismissed wrongful retention claim.  It was admitted to help prove that *other* constitutional violations, *i.e.*, judicial deception and seizure of property beyond the scope of the warrant, caused Plaintiffs' pain and suffering and Brown's suicide.  It was relevant to show that Lambert's retention of the property, when he knew it had no evidentiary value, and use of the property against Brown, knowing he obsessed over its return, was a factor in causing Plaintiffs' pain and suffering and driving Brown to suicide.  Thus, evidence concerning Lambert's continued retention of the property was an important piece of evidence to establish causation and damages.  It was highly probative considering the issues in the case and not outweighed by undue or unfair prejudice.  For all of these reasons, the Court denies Defendants' request for a new trial based on the Court's evidentiary rulings.

## G.   Jury Instruction Error

Defendants' final argument in support of their motion for new trial concerns the jury instructions.

> The standard of review on appeal for an alleged error in jury instructions depends on the nature of the claimed error. When an appellant alleges an error in the formulation of the jury instructions, the instructions are considered as a whole and an abuse of discretion standard is applied to determine if they are misleading or inadequate.

*Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 606 (9th Cir. 1993) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1481 (9th Cir. 1992)).  "However, where an appellant claims the trial court misstated the elements that must be proved at trial, the reviewing court must view the issue as one of law and review the instructions de novo."  *Id.* (citing *Caballero v. City of*

*Concord*, 956 F.2d 204, 206 (9th Cir. 1992)). Here, Defendants argue the Court erred in failing to give their proposed Instruction Number 4, and that the instruction on the familial association claim is legally incorrect. The Court will review each argument under each respective standard.

Defendants' proposed Instruction Number 4, entitled "42 U.S.C. § 1983: No Punitive Damages Against the City of San Diego," stated: "The City of San Diego is not a party in this action. You are not to send a message to the City of San Diego, to teach it a lesson, or to punish it or to deter others from committing similar wrongs." (ECF No. 128 at 23.) Defendants argue the Court's failure to give this instruction, coupled with Plaintiffs' counsel's "misconduct," "allowed the jury to assume that the City would pay the $6 million dollars that was unquestionably intended to punish not only Lambert but the City as well." (Mem. of P. & A. in Supp. of Mot. at 22-23.) As discussed, the Court disagrees that counsel engaged in any misconduct. The Court also disagrees that the failure to give this proposed Instruction warrants a new trial. Considering the instructions as a whole, the decision not to give this Instruction did not render the instructions misleading or inadequate. The Instruction was unnecessary and duplicative. As discussed, the jury had been informed since voir dire that the City was not a party to the case. (*See* Joint Statement of the Case, ECF No. 126.) In addition, there is no evidence the jury's damages award was intended to punish the City. Accordingly, this argument does not warrant a new trial.

Defendants' final argument is that the familial association instruction was legally erroneous. Specifically, Defendants argue the instruction should have set out the "shocks the conscience" standard rather than deliberate indifference. This argument has no merit. The Court's instruction on the familial association claim was based on Ninth Circuit Model Civil Jury Instruction 9.32, which governs claims for violation of the right to familial association. The comments to that Instruction explain the general standard for substantive due process claims is "shocks the conscience," but "[u]nder the overarching test of whether the official's conduct 'shocks the conscience' are two standards: the more

demanding 'purpose to harm' standard and the lesser 'deliberate indifference' standard." Ninth Cir. Model Civil Jury Instructions, 9.32 Particular Rights—Fourteenth Amendment—Due Process—Interference with Parent/Child Relationship, Comment (2018 ed.).  The Comment goes on to state:

> Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Id.* (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  Here, there can be no dispute the facts of this case, which unfolded over the course of ten months, warranted the deliberate indifference standard.  Accordingly, there was no error in the Court's instruction on the familial association claim, and no basis for a new trial.[8]

## III.

## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Turning to Defendants' JMOL motion, Federal Rule of Civil Procedure 50(a)(1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

---

[8]  Defendants also allege the verdict form on the familial association claim was erroneous for the same reason.  The Court rejects this argument as well and notes that Defendants' proposed verdict form, which the Court adopted with modifications, set out the deliberate indifference standard rather than the "purpose to harm" standard or the more general "shocks the conscience" standard.  (*See* ECF No. 170 at 4.)

Fed. R. Civ. P. 50(a)(1).  "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion.  Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  In the Ninth Circuit, "'[j]udgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion.'" *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (quoting *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002)).  "In other words, '[a] motion for a judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor.'" *Id.* (quoting *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005)).  When considering a motion for judgment as a matter of law, the court must view the evidence "'in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.'" *Id.* at 1205-06 (quoting *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)).

Defendants raise several arguments in their JMOL motion, most of which were addressed above in the context of Defendants' motion for new trial.  The only arguments that remain are: (1) whether Defendant Lambert is entitled to judgment as a matter of law on the claim that the warrant was overbroad, (2) whether Defendant Lambert is entitled to judgment as a matter of law on the seizure beyond the scope of the warrant claim, and (3) whether Defendants are entitled to qualified immunity on the judicial deception claim and seizure beyond the scope claim.

## A.    Overbroad Warrant

In their second claim, Plaintiffs alleged Defendant Lambert violated their Fourth Amendment rights by obtaining an overbroad search warrant.  During trial, Plaintiffs moved for a directed verdict on this claim, which the Court granted in part.  (*See* ECF No. 202 at 217-226.)   The Court found the warrant was overbroad in certain respects, specifically, Paragraph 5 of the warrant which allowed for seizure of "address books, diaries/journals, handwritten in nature."  (*Id.* at 226.)  However, the issues of causation and damages for that claim were submitted to the jury, and on those issues the jury found in favor of Defendant Lambert.  (*See* ECF No. 191 at 2.)  Plaintiffs do not challenge this

aspect of the jury's verdict and the judgment entered on the verdict does not speak to this claim.  Thus, Defendants' JMOL motion on this claim is denied as moot.

**B.      Seizure Beyond the Scope of the Warrant**

On the seizure claim, Defendants argue they are entitled to judgment as a matter of law because "Plaintiffs presented no evidence that Detective Lambert was at the Brown house during the search and seizure and actually seized items from the house or garage." (Mem. of P. & A. in Supp. of Renewed Mot. at 24.)  However, Plaintiffs did present such evidence when Mekenas-Parga testified that Lambert was present during the search. (Trial Tr. at 406, ECF No. 199.)  Accordingly, this argument does not warrant judgment as a matter of law in favor of Defendant Lambert.

**C.      Qualified Immunity**

Defendants' final argument on their JMOL motion is that they are entitled to qualified immunity on both the judicial deception and seizure beyond the scope claims. This is at least the fourth time Defendants have raised this issue in this case.  First, Defendants raised qualified immunity in their motion for summary judgment, which the Court denied.  Defendants then appealed that decision to the Ninth Circuit, which affirmed this Court's ruling on those claims.  Defendants then filed a petition for writ of certiorari with the United States Supreme Court, which denied the petition.

Despite these decisions from three separate courts, Defendants persist with their argument that they are entitled to qualified immunity on these claims.  Construing the evidence in the light most favorable to Plaintiffs, which is required on the present motion, the Court disagrees.  As set out above in the discussion of the new trial motion, there was sufficient evidence for the jury to find for Plaintiffs on both of these claims.  The jury found, based on substantial evidence, that Defendants violated Plaintiffs' constitutional rights in both the acquisition and the execution of the warrant, and Defendants have failed to show those rights were not "clearly established" at the time of Defendants' conduct.

/ / /

/ / /

Accordingly, Defendants are not entitled to judgment as a matter of law on these claims on the basis of qualified immunity.[9]

## IV.

## CONCLUSION AND ORDER

For these reasons, Defendants' motions for new trial and renewed motion for judgment as a matter of law are denied.

**IT IS SO ORDERED**.

Dated:  August 12, 2020

Hon. Dana M. Sabraw
United States District Judge

---

[9]  Defendant Mekenas-Parga does not otherwise move for new trial or JMOL as the jury awarded nominal damages only on the sole claim against her for seizure beyond the scope of the warrant, finding Plaintiffs "failed to prove damages" against her.  (Jury Instruction No. 20, ECF No. 187; Special Verdict Form, ECF No. 190.)

15-cv-1583-DMS (WVG)